# United States Tax Court

T.C. Memo. 2023-129

MILL ROAD 36 HENRY, LLC,
MR36 MANAGER, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 11676-20.                          Filed October 26, 2023.

————

MRP, an LLC organized by real estate professionals and investors to buy and sell land, acquired 117 acres of undeveloped suburban land along a county road for $1.25 million (about $10,700 per acre) in December 2014. BI, an entity owned by another real estate professional, thereafter acquired from MRP a 25% undivided interest in these parcels for $315,000. MRP and BI then partitioned 40 acres of the eastern tract to create a new tract ("Tract"). MRP and BI then contributed Tract to MR36, a TEFRA partnership. MR36's only asset was Tract. MRP then sold the remainder of the 117 acres to two other entities.

In September 2016 an investment fund, IF, acquired a 97% ownership interest in MR36 for $1 million (equivalent to about $25,800 per acre). Under the control of IF, MR36 donated by deed in December 2016 a perpetual conservation easement (constituting a "qualified real property interest" under I.R.C. § 170(h)(1)(A)) on 33 acres of Tract to SCT (a "qualified organization" under I.R.C. § 170(h)(1)(B)) for "conservation purposes" under I.R.C. § 170(h)(1)(C). Relying on a professional appraisal, MR36 claimed a charitable contribution deduction of $8,935,000 (about $270,800 for each of the 33 acres) for a "qualified

**[\*2]** conservation contribution" under I.R.C. § 170(h) on its tax return.

R examined MR36's return and issued a Notice of Final Partnership Administrative Adjustment ("FPAA") determining to disallow the charitable contribution deduction. MR36's TMP filed a petition in this Court challenging the FPAA.

*Held*: MR36 made a qualified conservation contribution under I.R.C. § 170(h) and attached to its return a qualified appraisal by a qualified appraiser under I.R.C. § 170(f)(11) and Treas. Reg. § 1.170A-13(c)(3).

*Held, further*, the value of the easement granted on Tract is $900,000 (about $27,300 per acre)—the amount conceded by R.

*Held, further*, because Tract had been inventory held for sale to customers in the ordinary course of business by MRP and BI—the partners who contributed it to MR36—the amount of MR36's deduction is limited under I.R.C. § 170(e)(1)(A) to its adjusted basis in Tract, $416,563.

*Held, further*, the I.R.C. § 6663 fraud penalty is not applicable to MR36, but the I.R.C. § 6662(h) gross valuation misstatement penalty is applicable. To the extent the deduction is disallowed not because of valuation but because of the basis limitation of I.R.C. § 170(e)(1)(A), the penalty for a substantial understatement of income tax under I.R.C. § 6662(b)(2) applies, or, in the alternative, the penalty for negligence under I.R.C. § 6662(b)(1) applies.

————————

*Anson H. Asbury*, *R. Brian Gardner III*, *Ethan J. Vernon*, and *Lauren T. Heron*, for petitioner.

*Olivia Hyatt Rembach*, *Ashley M. Bender*, *Kristina L. Rico*, *Elizabeth C. Mourges*, *Kimberly B. Tyson*, and *Matthew T. James*, for respondent.

[*3]                    TABLE OF CONTENTS

FINDINGS OF FACT ................................................................. 6
Jeff Grant's real estate business ............................................. 6
Benjamin Helms and Benwood Investments, LLC .............................. 7
Dr. Chen, Qin Meng, and Zhen Wang ........................................ 7
Daniel Carbonara and Old Ivy Capital Partners, LLC ......................... 8
Adam Price and Falcon Design Consultants ................................... 9
Ron S. Foster & Co., Inc. .................................................... 9
Mill Road Partners ........................................................... 9
The Mill Road Tract ......................................................... 10
Mill Road 36 ................................................................ 10
Falcon Design's concept plan ................................................ 11
Mill Road 36's zoning application ........................................... 12
Mr. Grant's other properties ................................................ 15
MR36 Investments, LLC ..................................................... 15
Sale of interests in Mill Road 36 ........................................... 16
Mill Road 36's easement donation ........................................... 16
SCT's baseline report ....................................................... 17
The easement deed .......................................................... 17
Valuing the easement for the 2016 tax return ............................... 19
Reporting the easement donation on Mill Road 36's 2016 return ....... 21
IRS examination and FPAA ................................................. 23
Tax Court proceedings ...................................................... 24
The value of the Mill Road Tract easement ................................. 24

        Petitioner's expert, Mr. Clanton ................................... 25
        The Commissioner's expert, Mr. Kinney ............................ 25
        Our findings as to the value of the Mill Road Tract .............. 26

OPINION ........................................................................ 26

I.    Burden of proof ........................................................ 26

II.   Qualified conservation contributions .................................. 27

      A.   Whether Mill Road 36 donated a qualified real property
           interest .......................................................... 27
           1.    Donative intent ............................................ 27
           2.    The existence of the partnership .......................... 28

      B.   Whether the easement satisfies an enumerated
           conservation purpose ............................................. 30
           1.    Protection of a relatively natural habitat ............... 31
           2.    Preservation of open space ................................ 35
           3.    The size of the Mill Road easement ....................... 36

4

**[\*4]** C.　Whether the easement protects its conservation purposes in perpetuity ........................................... 39

III.　Compliance with the substantiation requirements ...................... 40

　　A.　A summary of the requirements............................................. 40
　　B.　The two supposed defects ...................................................... 41
　　　　1.　Whether Mill Road 36 "had knowledge of facts" . 42
　　　　2.　Whether necessary signatures are missing......... 45

IV.　The value of the easement donation ............................................. 46

　　A.　The method of valuing a conservation easement................... 46
　　B.　The value of the Mill Road Tract easement.......................... 48
　　　　1.　Legal permissibility ............................................. 48
　　　　2.　Sales comparables ................................................ 50
　　　　3.　Sales history of the Mill Road Tract ................... 52

V.　The amount of the allowable charitable contribution deduction................................................................................... 53

　　A.　Special rules for inventory property..................................... 54
　　B.　The Mill Road Tract as inventory ........................................ 55

VI.　Penalties .......................................................................................... 56

　　A.　Section 6663 fraud penalty.................................................... 57
　　　　1.　General fraud penalty principles ......................... 57
　　　　2.　Liability for the fraud penalty ............................. 58

　　B.　Section 6662 accuracy-related penalty.................................. 64
　　　　1.　General accuracy-related penalty principles....... 64
　　　　2.　Liability for an accuracy-related penalty ........... 65
　　　　3.　Whether Mill Road 36 is liable for an accuracy-related penalty..................................................... 67

VII.　Conclusion...................................................................................... 71

APPENDIX.............................................................................................. 72

[*5]     MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:   At issue is a charitable contribution deduction for the donation in 2016 of a conservation easement on 39.68 acres of real property ("Mill Road Tract") by a TEFRA partnership,[1] Mill Road 36 Henry, LLC ("Mill Road 36"),[2] to the Southern Conservation Trust, Inc. ("SCT").   Pursuant to section 6223(a)(2),[3] the IRS issued to Mill Road 36 a Notice of Final Partnership Administrative Adjustment ("FPAA") disallowing the $8,935,000 charitable contribution deduction claimed on Mill Road 36's Form 1065, "U.S. Return of Partnership Income", for the tax year ending on December 31, 2016.  MR36 Manager, LLC, as Tax Matters Partner ("TMP") of Mill Road 36, timely filed a petition in this Court challenging the determination.

The issues for decision are: (1) whether Mill Road 36 attached to its tax return a "qualified appraisal" by a "qualified appraiser" within the meaning of section 170(f)(11) and Treasury Regulation § 1.170A-13(c)(3); (2) whether the easement is a "qualified conservation contribution" under section 170(h); (3) the fair market value of the easement; (4) whether Mill Road 36's deduction is limited to its basis in the donated property under section 170(e)(1)(A); and (5) whether the

---

[1] Before its repeal, *see* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625, the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, §§ 401–406, 96 Stat. 324, 648–70, governed the tax treatment and audit procedures for many partnerships, including Mill Road 36 Henry, LLC.  TEFRA partnerships are subject to special tax and audit rules.  *See* §§ 6221–6234.  TEFRA requires the uniform treatment of all "partnership item[s]"—a term defined by section 6231(a)(3)—and its general goal is to have a single point of adjustment for the Internal Revenue Service ("IRS") rather than having it make separate partnership-item adjustments on each partner's individual return.  *See* H.R. Rep. No. 97-760, at 599–601 (1982) (Conf. Rep.), *as reprinted in* 1982-2 C.B. 600, 662–63.  Under TEFRA, if the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing a Notice of Final Partnership Administrative Adjustment.  § 6223(a).

[2] The name of the entity at issue in this case—"Mill Road 36 Henry LLC"— followed a convention used by Mr. Jeff Grant (discussed below) for an entity to own property: "Mill Road" was an adjacent road; "36" was the approximate acreage of the property to be owned by the entity (although in fact the property had a total of about 40 acres, and the easement covered about 33 acres); and "Henry" was the name of the county in which the property was situated.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. ("Code"), as in effect at the relevant times; regulation references are to the Treasury Regulations ("Treas. Reg.") codified in Title 26 of the *Code of Federal Regulations*, as in effect at the relevant times; and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

**[*6]** fraud penalty under section 6663, or in the alternative an accuracy-related penalty under section 6662, is applicable to Mill Road 36 for 2016. We hold (1) that the appraisal attached to Mill Road 36's tax return is a qualified appraisal by a qualified appraiser; (2) that the easement donated on the Mill Road Tract is a qualified conservation contribution under section 170(h); (3) that the value of the easement donated by Mill Road 36 was $900,000 (i.e., about $8 million less than the value Mill Road 36 claimed on its return); (4) that the amount of Mill Road 36's deduction is limited to $416,563 (i.e., Mill Road 36's basis in the Mill Road Tract) under section 170(e)(1)(A); and (5) that the section 6663 fraud penalty is not applicable to Mill Road 36 for 2016, but that accuracy-related penalties under section 6662 are applicable.

## FINDINGS OF FACT

When MR36 Manager, LLC, filed the petition commencing this case, the principal place of business of Mill Road 36 was in Georgia.[4]

*Jeff Grant's real estate business*

Jeff Grant was born and raised in Henry County, Georgia, and he has lived there for most of his life. Mr. Grant started his business in real estate buying timberland in the early 1980s. He has extensive knowledge and experience in the Henry County real estate market. At the time of trial Mr. Grant owned (outright or through a partnership) approximately 21,000 acres of land—4,000 acres of which are in Henry County.

Sometime after 2008 Mr. Grant started Southern Consulting Services, for which he is owner, chief executive officer, and chief financial officer. Through Southern Consulting Services Mr. Grant makes money from consulting fees and by either selling land to developers outright or forming joint ventures with them. Mr. Grant sells land to developers for what he refers to as "dirt price", which he defines as the price of the undeveloped land (i.e., without utilities or other infrastructure installed) but with a concept plan.[5] He determines the "dirt" sale price on the basis of the total number of residential units in

---

[4] Under section 7482(b)(1)(E), venue for an appeal would be the Court of Appeals for the Eleventh Circuit, unless stipulated otherwise pursuant to section 7482(b)(2).

[5] The alternative to "dirt price" is "horizontal development price", which includes the cost of installing water, sewer, storm drainage, streets, and erosion control.

[*7] the concept plan, and it is Mr. Grant's objective to increase the sale price by maximizing the number of residential units to the extent allowed under local county ordinances. Although Mr. Grant makes a profit from land sales, he often sells property for less than its appraised value so that a prospective buyer-developer will consider the land a bargain and a profitable prospect. Whether the land sold by Mr. Grant to a buyer is ultimately developed pursuant to the concept plan is immaterial to Mr. Grant, because his business activity is merely to sell the land at a profit.

*Benjamin Helms and Benwood Investments, LLC*

Benjamin Helms is a lifelong resident of Henry County, Georgia. Mr. Helms and Mr. Grant have been friends since childhood and have worked together in the real estate business since the 1980s. Mr. Helms is an officer of Southern Consulting Services along with Mr. Grant, but he also owns his own entity, Benwood Investments, LLC ("Benwood Investments"), which he started in May 2011. Benwood Investments is in the business of buying and selling real estate.

*Dr. Chen, Qin Meng, and Zhen Wang*

Dr. Chen (now deceased) was an orthopedic surgeon and from 2014 was a business partner of Mr. Grant in the real estate business. Qin Meng is Dr. Chen's widow and is a dual citizen of the United States and China. Ms. Meng is a real estate investor, and she continued investing with Mr. Grant after Dr. Chen's death. Zhen Wang is an accountant and real estate investor who lives in Shanghai, China, and is Ms. Meng's brother-in-law. Mr. Wang also began investing in real estate with Mr. Grant in 2014. Ms. Meng's and Mr. Wang's investments in real estate with Mr. Grant are generally undertaken by means of limited liability companies ("LLCs") with Mr. Grant as managing member, and Ms. Meng and Mr. Wang trust Mr. Grant to find good investment properties for their capital. Each LLC created by Mr. Grant for this purpose holds a particular property as its only asset and is generally named using a combination of the road name, county, and acreage. One such entity was Mill Road Partners 125, LLC ("Mill Road Partners")—an entity formed specifically to purchase the parent tract (which was evidently expected to be 125 acres but actually consisted of 117 acres) that included the eventual 40-acre property at issue in this case (discussed below at page 10).

[*8] *Daniel Carbonara and Old Ivy Capital Partners, LLC*

Daniel Carbonara began his career in Atlanta, Georgia, at the public accounting firm KPMG, working on mergers and acquisitions transactions. But following his receipt of a master of business administration degree from Duke University, Mr. Carbonara moved to New York City. There he worked in corporate finance and investment banking, and his responsibilities included finding and connecting networks of investors and businesses to "create transactions". Mr. Carbonara eventually moved with his family back to the Atlanta area, and after a few years he began working for Brookstone Partners— a private equity fund—where his responsibility was to find opportunities to deploy firm and third-party capital.

Ultimately Mr. Carbonara formed Old Ivy Capital Partners, LLC ("Old Ivy"), as a joint venture with Peachtree Investment Solutions—a firm owned by two individuals with backgrounds in tax equity.[6] Through Old Ivy Mr. Carbonara gained experience structuring tax equity transactions and syndication of tax credits and conservation easements. The partners agreed to terminate the original Old Ivy (organized in Delaware) in 2013, and in that same year Mr. Carbonara reformed Old Ivy as a Georgia LLC and was its sole member and owner. Through Old Ivy, Mr. Carbonara thereafter marketed investment opportunities to raise third-party capital for business opportunities including real estate and operating businesses to generate above-stock-market returns. Having grown up near Henry County, Mr. Carbonara was familiar with its real estate market.

Mr. Carbonara met Mr. Grant in 2014 and began purchasing property from him. Each sale to Mr. Carbonara of land owned by Mr. Grant (of which there were at least nine) was structured as a sale of a partnership interest in the partnership which held the property, and Mr. Grant was aware that Mr. Carbonara intended to donate syndicated conservation easements on the properties.

---

[6] *See* Phillip Brown & Molly F. Sherlock, Cong. Rsch. Serv., R41635, *ARRA Section 1603 Grants in Lieu of Tax Credits for Renewable Energy: Overview, Analysis, and Policy Options* 16 (2011) ("Tax equity is a hybrid (debt/equity) type of investment that has a preferred position, over the project sponsor, for the project cash flows and tax benefits").

**[*9]** *Adam Price and Falcon Design Consultants*

Adam Price is a professional engineer who does business in the State of Georgia (as well as other states) and is the managing partner of Falcon Design Consultants ("Falcon Design"). Mr. Price's work includes land surveying, infrastructure designing (such as roads, pipes, water lines, sewer lines, storm sewers), land grading, and construction administration. Mr. Price did not design vertical buildings as an architect would do; rather, his work involved preparing a site for a future building. Mr. Grant hired Falcon Design (and Mr. Price) to create concept plans for 27 projects in 2016—12 of which were for assisted living facilities (including the Mill Road Tract, as discussed below).

*Ron S. Foster & Co., Inc.*

Ron Foster is a professional appraiser in Lilburn, Georgia. Mr. Grant hired Mr. Foster in June 2016 to appraise 33 properties—one of which was the Mill Road Tract. Janet Gaskin and David Miller worked for Mr. Foster and frequently corresponded with Mr. Grant on Mr. Foster's behalf.

*Mill Road Partners*

Mill Road Partners is a Georgia LLC organized by Mr. Grant, Ms. Meng, and Mr. Wang to buy and sell land. On December 12, 2014, Mill Road Partners acquired two tracts of undeveloped land in a highway corridor of Henry County designated for medium to high density development (a 49.83-acre tract along the western frontage of Mill Road and a 67.57-acre tract along the eastern frontage of Mill Road, totaling about 117 acres) for total consideration of $1,250,000 (i.e., averaging under $10,700 per acre). Approximately two weeks later, on December 30, 2014, Benwood Investments acquired a 25% undivided interest in these tracts along Mill Road for consideration of $315,000 (an amount corresponding to about $10,770 per acre).[7] The 67.57-acre tract east of Mill Road contains the acreage that would eventually be subject to the conservation easement at issue in this case. Mill Road Partners and Benwood Investments then partitioned 39.68 acres (which we

---

[7] Benwood Investment acquired an interest in the land itself, not an interest in Mill Road Partners. Benwood Investments acquired not 25% of the acreage but rather an undivided 25% interest in the acreage. But if those proportions are treated as equivalent, then Benwood Investment's 25% equated to 29.25 acres (117 acres × 0.25 = 29.25 acres), and its purchase price of $315,000 divided by 29.25 yields $10,769 per acre.

[*10] hereafter round up to 40 acres) to create the Mill Road Tract, which they then contributed to Mill Road 36 on August 28, 2015. Pursuant to section 723, Mill Road 36 took from its contributing partners a "carry-over" basis of $428,317 in the Mill Road Tract.

Of the original 117 total acres, the remaining 77 acres (after partition of the 40-acre Mill Road Tract) were disposed of as follows: A 31.5-acre parcel to the southeast of the Mill Road Tract was sold to Evergreen Management Group in an arm's-length commercial transaction for which Mr. Grant was paid a commission for his role as an agent facilitating the sale. The remaining parcels were later sold to 49 Mill Road Henry, LLC (another LLC controlled by Benwood Investments, Ms. Meng, and Mr. Wang).

*The Mill Road Tract*

As the Commissioner's expert explains, "Henry County is located within the southern portion of the Atlanta metropolitan area", and the Mill Road Tract is "in an area of heavy commercial and residential development". The Commissioner acknowledges that the Mill Road Tract "has intensely developed subdivisions on the north and east sides".

But the Mill Road Tract is 40 acres of undeveloped land located in that rapidly growing suburb. Mill Road runs along its western border. Residential development is to the north and east. A tributary stream to Birch Creek runs inside the property's southern border and establishes a wetland area and riparian buffer that covers approximately 27% of the property. Birch Creek feeds into the larger Walnut Creek, which is a main tributary to the South River—a designated high priority watershed in the Georgia State Wildlife Action Plan ("SWAP"). The interior of the Mill Road Tract is 61% oak-hickory forest, which is visible along one-quarter mile of Mill Road.

*Mill Road 36*

Mill Road 36 is a Georgia LLC, treated as a partnership for federal income tax purposes. Mr. Grant organized Mill Road 36, and the original members were Ms. Meng (with a 20% interest), Mr. Wang (with 55%), and Benwood Investments (with 25%). David Harris (a lawyer engaged by Mr. Grant) filed articles of organization for Mill Road 36 with the State of Georgia on December 10, 2015. (Before the date of that filing, however, Mr. Grant, operating as managing member in the name of Mill Road 36, acquired title to the 40-acre Mill Road Tract, engaged Falcon Design for a concept plan and Mr. Foster for an appraisal, and

[*11] marketed the Mill Road Tract for sale to developers or other real estate investors.) Mill Road 36's only asset was the 40-acre Mill Road Tract, and its ostensible business purpose was to hold the Mill Road Tract for sale to a developer. Accordingly, Mr. Grant had a topography survey done on the Mill Road Tract, as well as soil studies, rock studies, wetlands surveys, and flood zone surveys. Mr. Grant also had concept plans prepared for the Mill Road Tract to be developed for single-family, multi-family, and assisted-living units.

*Falcon Design's concept plan*

In 2015 Falcon Design prepared a horizontal[8] concept plan for a senior-living development on the Mill Road Tract, considering its topography, wetlands (as recognized and marked by Henry County), and the Birch Creek flood plain. Mr. Price reviewed the concept plan. The concept plan included both a 552-unit assisted living facility (on the northern portion of the Mill Road Tract) and 125 "senior independent living" units[9] (on the southern portion) for a total of 677 units.

Mr. Price came up with the 677-unit plan by using as a model the building layout of an assisted living facility in Alabama and in effect placing that model on the Mill Road Tract. Mr. Grant indicated to Mr. Price that the concept plan should show buildings four stories high and should include the maximum number of units within the physical limitations of the Mill Road Tract. Mr. Price was not aware of any specific requirements that the Georgia Department of Community Health imposes on "assisted" and "independent" living facilities, but Mr. Grant assumed that, because the "assisted living" ordinance in Henry County (discussed below) does not specify density requirements or density caps, a development with as many units as physically possible on the land could be approved. Mr. Grant was indifferent to the average bed capacity for assisted living facilities in Georgia because his goal with any property he sold was to maximize the total number of units proposed for the property (and thereby to maximize its potential price). The intended buyer of the Mill Road Tract with the concept plan for a senior

---

[8] The concept plan is "horizontal" because it designs only roads, parking, and building placement within the Mill Road Tract, and does not undertake the "vertical" design of any buildings that would need to be constructed to develop the property in accordance with the plan. Such a design is typically done by an architect.

[9] According to petitioner's expert, Mr. Clanton, "[i]ndependent living communities are an age restricted development that enable individuals to maintain their lifestyles without custodial or medical assistance."

[*12] living development would have been a senior living developer. Neither Mr. Price nor Mr. Grant had any specialized training regarding assisted living facilities, nor was either of them familiar with the legal requirements governing approval, licensure, construction, and operation of assisted living facilities in Georgia.

*Mill Road 36's zoning application*

Zoning approval for an application for development in Henry County generally followed a three-step process: first, the application had to receive a recommendation from the Planning and Zoning staff that the Zoning Advisory Board approve the requested "conditional use"— i.e., use of the property subject to conditions to be stated in the eventual permit that the county would issue; second, the conditional use had to be approved by the Zoning Advisory Board itself; and third, the conditional use then had to be approved by the Commissioner of Planning and Zoning in Henry County. However, because of a need in Henry County for senior assisted living facilities, Henry County Planning and Zoning removed the third step of the approval process so that the final step—approval by the Commissioner—would no longer be required. That is, approval of an assisted living facility development in Henry County followed a two-step process. Generally, if the Henry County Planning and Zoning staff recommended that a conditional use be approved, then the Zoning Advisory Board approved the conditional use, and the zoning approval was thereby final.

Mill Road 36 filed on July 8, 2016, an application for conditional use to develop an assisted facility on the Mill Road Tract. The application was prepared by Falcon Design and included its concept plan for a senior-living development on the Mill Road Tract.

Henry County Planning and Zoning prepared a "Conditional Use Evaluation Report" for the proposed assisted living facility on the Mill Road Tract, which it issued on July 8, 2016. The report recommended county approval by the Zoning Advisory Board subject to, inter alia, the following condition:

> The deed of the subject properties shall be restricted with the following clause: "Only those facilities that qualify as assisted living facilities per *ULDC* [Unified Land Development Code]*, Chapter 4, Section 4.03.18* and *Appendix A* may be constructed, operated, and maintained on these properties."

**[\*13]** Appendix A to the cited provision of the Henry County Code of Ordinances, Unified Land Development Code defines "assisted living facility" as

> *a state-licensed* use in which domiciliary care is provided to adults who are provided with food, shelter and personal services within independent living units which could include kitchen facilities in which residents have the option of preparing and serving some or all of their own meals. This use *shall not include hospitals, convalescent centers, nursing homes, hospices, clinics, or similar institutions devoted primarily to the diagnosis and treatment of the sick or injured.*

(Emphasis added.) This definition of "assisted living facility" (implicated in the condition stated in the "Conditional Use Evaluation Report" for the Mill Road Tract) includes two features that must be noted:

First, this definition begins with the point that an "assisted living facility" is a "state-licensed use". The state regulations governing licensure to operate such a facility in Georgia are found in Ga. Code Ann. §§ 31-6-40 (2009) and 31-6-43 (2012) and Ga. Comp. R. & Regs. 111-8-63 (2012), and they require the facility to obtain (1) a certificate of need from the Georgia Department of Community Health, Healthcare Facility Regulation Division, Office of Health Planning, Ga. Code Ann. § 31-6-40(a), for which it must first submit a letter of intent to submit an application for a certificate of need and, at least 30 days later, the actual application, Ga. Code Ann. § 31-6-43(a), and (2) a permit to operate an assisted living facility on the property, Ga. Comp. R. & Regs. 111-8-63-.05, for which an application must be submitted showing floor plans, pictures, personnel, ownership, zoning compliance, and financial stability. No such submissions were made with respect to the Mill Road Tract.

Second, the county's definition of "assisted living facility" excludes facilities for treating the sick and injured, and the definition evidently presumes that all residents are instead capable of "independent living" (though neither "independent living units" nor "independent living facility" are terms specifically defined in Appendix A).

**[*14]** Approving an assisted living development (or leaving the application pending) had an effect on Henry County's overall development plan, and therefore the Planning and Zoning staff, after giving its recommendation of approval for conditional use, requested that Mr. Grant withdraw the application if he thought that the assisted living facility granted conditional use might not actually be developed. Mr. Grant obliged and withdrew the application because the decision whether to proceed to actual development was not up to him but rather to his eventual buyer. The Commissioners of Henry County Planning and Zoning asked Mr. Grant to withdraw his conditional use applications because those multiple applications would disrupt the county's planning and approval of other assisted living facility developments, if the property that had been either approved or recommended for approval for conditional use as an assisted living facility was instead thereafter placed in conservation while its application remained pending.

Mr. Grant communicated to Mr. Price of Falcon Design approximately one week before receiving the approval recommendation letter that it was his intention to withdraw the application upon receipt of the letter approving conditional use.[10]  Consistent with that communication, Mill Road 36 did withdraw its conditional approval application on July 11, 2016, after receiving the letter from the Henry County Planning and Zoning recommending approval by the Zoning Advisory Board. However, withdrawal of the application was not the only option available to Mill Road 36. The other available option would have been to table the application by submitting a formal written request and paying a nominal $300 fee. If the application were tabled, then when the applicant later decided to proceed, consideration of the application would resume from the point in the approval process at which it had previously been tabled. But if an application was withdrawn, then the applicant had to start the approval process from the beginning if it were to resubmit an application.

---

[10] Of the multiple properties for which Falcon Design created an assisted living facility concept plan for Mr. Grant, none were ultimately developed into an assisted living facility, and many of the conditional use applications to Henry County Planning and Zoning for conditional approval were withdrawn. *See infra* Appendix. In fact, many of the assisted living concept plans that Falcon Design prepared for Mr. Grant were for properties that Mr. Grant ultimately sold to Mr. Carbonara and upon which Mr. Carbonara organized syndicated conservation easement donations.

[*15] *Mr. Grant's other properties*

Concurrent with Mr. Grant's work on the Mill Road Tract, he acted as an owner or agent of at least 10 other entities, each of whose only asset was a parcel of property in Henry County. *See infra Appendix.* For each of these properties, Mr. Grant hired Mr. Price to prepare a concept plan for an assisted living facility (ranging between 650 and 1,800 senior living units) to be submitted to Henry County Planning and Zoning with an application for "conditional use". However, after Mr. Grant's entity received a zoning verification letter or a recommendation of approval from the Planning and Zoning staff, in each instance the application for conditional use was withdrawn. The concept plans for these properties proposed facilities with numbers of units ranging from 585 to 1,838 and totaling 9,264. Conservation easements were ultimately donated on all of these 10 other properties, and Mr. Grant hired Mr. Foster to appraise each easement on the basis of its highest and best use before the donation as an assisted living facility. The Mill Road Tract was plainly not a unique parcel, and a buyer with an actual interest in building an assisted living facility would have had his choice of parcels selling for less than $11,000 per acre, any of which could receive, and many had received, the same recommendation of approval by county zoning staff.

*MR36 Investments, LLC*

In June 2016 Mr. Carbonara was negotiating with Mr. Grant to purchase the 40-acre Mill Road Tract—i.e., to purchase the tract indirectly by purchasing its owner, Mill Road 36—and that purchase would be made by another entity: MR36 Investments, LLC ("MR36 Investments"), a Delaware LLC formed by Mr. Carbonara on July 19, 2016. MR36 Investments, at the direction of Mr. Carbonara, created a Private Placement Memorandum for prospective investors on August 1, 2016. MR36 Investments' private placement memorandum stated that its business purpose was "to acquire, own and hold for investment a 97.99% interest in Mill Road 36 Henry LLC". It offered "up to four hundred ten (410) units of membership interest (the 'Units') at $5,000 per Unit"[11] and stated that "[p]urchasers of the Units offered hereby will become Investor Members in the Fund and will receive allocation of income, loss, deductions and tax credits". The memorandum explained

---

[11] Four hundred ten units at $5,000 each would yield a total of $2,050,000. If that total is attributed to Mill Road 36's 40 acres, then the per-acre amount would be about $51,250.

**[*16]** that the investment options for the Mill Road Tract were (1) "to realize possible capital appreciation in the value of the property," (2) "to develop the property, and/or" (3) to "grant a conservation easement over the Property in order to preserve the Property and to generate federal income tax benefits." Under the terms of MR36 Investments' operating agreement, any of these three options could be approved by a simple majority vote of the partners, and voting was conducted by electronic ballot via email.

*Sale of interests in Mill Road 36*

On September 20, 2016, each member in Mill Road 36 (Ms. Meng, Mr. Wang, and Benwood Investments) sold most or all of its interest to MR36 Investments and executed an Amended Operating Agreement. Afterwards the percentage ownership in Mill Road 36 was the following: Ms. Meng (3%), Mr. Wang (0%), Benwood Investments (0%), MR36 Investments (97%). MR36 Investments paid $1 million for its 97% ownership in Mill Road 36, which corresponded to about $25,800 per acre for the Mill Road Tract.[12] MR36 Manager then became the managing member of Mill Road 36. Mr. Carbonara owns 100% of MR36 Manager through Old Ivy.

*Mill Road 36's easement donation*

On December 16, 2016—not quite three months after MR36 Investments purchased Mill Road 36—the members of MR36 Investments held a meeting at which they voted to approve the donation of a conservation easement on the Mill Road Tract. Mill Road 36 received a tax opinion letter from a professional adviser. On December 28, 2016, Mill Road 36 conveyed to SCT by deed dated that day an easement covering 32.96 acres (which we hereafter round up to 33 acres) of the Mill Road Tract. The 33-acre easement on the 40-acre Mill Road Tract excluded a roughly 6-acre flood plain along the tract's southern border and 1 acre in the tract's northwest corner.

---

[12] If 97% of Mill Road 36 was worth $1 million, then algebraically speaking 100% would have been worth $1,030,928. If Mill Road 36's only asset was the 40-acre Mill Road Tract, and if the purchase price of Mill Road 36 can be attributed entirely to that single 40-acre tract, then for each acre of the tract MR36 Investments paid $25,773. Petitioner disputes this equation.

**[*17]** *SCT's baseline report*

SCT—the donee of the Mill Road Tract easement—is a section 501(c)(3) public charity dedicated to conserving land in the southeastern United States.  Since its founding in 1993 it has conserved over 65,000 acres of land.  Before Mill Road 36's easement donation, SCT had prepared a baseline report for the Mill Road Tract dated December 15, 2016 ("Baseline Report"), describing the conservation values of the tract.  The Baseline Report identifies the Birch Creek floodplain, wetlands, and oak-hickory forest as habitats that the easement would protect.  The Baseline Report also explains that, by protecting the forest on the Mill Road Tract, the easement would preserve the view of the forest along Mill Road.  The Baseline Report further states that the easement will contribute to Georgia State and Henry County policies prioritizing green space in rapidly developing metro areas, impaired waters such as Walnut Creek and the South River, and air quality control.

*The easement deed*

The easement deed executed by Mill Road 36 lists the following conservation values:

> 1.  Protection of the Property provides for the protection of significant, relatively-natural habitat of fish, wildlife, or plants, or similar ecosystem, (including but not limited to, habitat for rare, threatened, and/or endangered species) within the meaning of § 170(h)(4)(A)(ii) of the Internal Revenue Code of 1986 . . . and promotion of the Georgia Comprehensive Wildlife Conservation Strategy (Aug. 2005) ("GCWCS"). . . .  The Property contains "High Priority Habitats" in the Piedmont Ecoregion.  Protection of these streams and habitats will ensure that the habitats remain preserved, supporting flora and fauna within the region, and will further the goals of GCWCS.  The Property also contains the following high priority habitats as defined by the Georgia State Wildlife Action Plan (SWAP).
>
> > a.  Oak Hickory Forest
> >
> > . . . .
> >
> > b.  Streams
> >
> > . . . .

[*18] 2. The preservation of certain open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State and local governmental policy, and will yield a significant public benefit in accordance with § 170(h)(4)(A)(iii)(II) of the Code. . . .

> a. Scenic Enjoyment. The property maintains a forested and open viewshed for the public, as visible from approximately 0.25 mile of Mill Road, a paved county road, that is highly travelled.

The easement deed states that it is preserving open space pursuant to the following governmental policies: GCWCS; the Agricultural Conservation Easement Program; the Georgia Conservation Use Value Assessment; the Georgia Forestry Commission—Urban Forest Priority Areas; and the Henry County Comprehensive Land Use Plan (2009).

To protect its conservation values, the easement deed establishes "Special Natural Areas", "Aesthetic Buffers", and a "Riparian Buffer" on designated portions of the Mill Road Tract. The Special Natural Areas include the oak-hickory forest, wetlands, and stream habitats, and they are designated on a map of the Mill Road Tract included in the Baseline Report. The easement deed affords, to the Special Natural Areas, heightened protections because they are considered "high-priority habitats". The Aesthetic Buffer "permanently protect[s] a 100' buffer strip of forest land along the property's frontage on Mill Road to provide a scenic benefit. And the "Riparian Buffer" establishes a 100-foot buffer "to preserve a permanent, vegetative buffer" along the tributaries to Birch Creek present on the Mill Road Tract.

The easement deed gives SCT the right to monitor Mill Road 36's compliance with its conservation terms, to enter the Mill Road Tract, and to enforce the terms of the easement. The easement deed prohibits Mill Road 36 (and future owners of the property) from altering the natural features of the Mill Road Tract, engaging in any residential or commercial activity, further subdividing the parcel, constructing any improvements, extracting any natural resources, installing utilities, or paving roads.

Mill Road 36 reserved in the easement deed (outside the Special Natural Areas) the right to conduct permitted agriculture in the "Early Successional/Old Field" area, to engage in certain recreational activities

**[*19]** such as hunting, fishing, camping, hiking, and horse-back riding for personal and educational purposes, and to construct small "Recreational-Only" structures.

We find that the conservation easement on the Mill Road Tract protects a relatively natural habitat within the meaning of section 170(h)(4)(A)(ii), and we further find that the conservation easement provides a scenic view to the general public which yields a significant public benefit within the meaning of section 170(h)(4)(A)(iii)(I).

*Valuing the easement for the 2016 tax return*

As early as June 23, 2016, Mr. Grant and Mr. Carbonara had directed Mr. Foster to appraise a conservation easement on the Mill Road Tract, and Mr. Grant formally hired Mr. Foster to appraise it on July 11, 2016. Mr. Foster appraised the value of the Mill Road Tract easement in a report dated March 16, 2017. The appraisal states: "The property [i.e., the Mill Road Tract] *is approved* for 677 Senior Assisted Living Units of any kind by the Henry County Planning and Zoning Authority." (Emphasis added.) In fact, as is explained above, the application had been withdrawn and no final approval had been obtained. Mr. Foster had been given a copy of the staff's report, which concludes with a "Recommendation" that "recommends Approval". His appraisal explains that "[t]he client provided a zoning verification letter (that can be found in the Addendum of this report)" and quotes the entire conclusion of the staff's letter (in a block quote with "Recommendation" rendered in bold typeface). *See* Ex. 31-J, at 65 (quotation in appraisal); Ex. 32-J, at 33–34 (staff letter in Addendum). If, in their conversations with the appraiser, Mr. Grant and Mr. Carbonara were imprecise on the important distinction between a recommendation and an approval, they did give him the actual document; and we know that he read it, because he quoted it in his appraisal; and we know that he saw the word "Recommendation", because he rendered it in bold.

The appraisal report states two extraordinary assumptions made by Mr. Foster in determining the value of the Mill Road Tract easement: first, that "[t]he subject property acreage provided by the client in the legal description is correct", and second, that "[i]nformation on the subject property provided to me by the client is correct". The appraisal report identifies the referenced "client-provided information" to be "concept plan, warranty deed and Deed of Easement" as well as the Baseline Report.

[*20] Mr. Foster valued the Mill Road Tract easement using the before-and-after method. Mr. Foster concluded "that the highest and best use of the subject property [*before* the donation] is for Senior Assisted Living/Senior Independent Living Development", and he considered this use to be legally permissible on the basis of the Conditional Use Evaluation Report from Henry County Planning and Zoning recommending zoning approval of an assisted living facility. Mr. Foster specifically stated that "[b]ased on [the Conditional Use Evaluation Report], the subject property is not considered to have any legal deterrents to development."

Mr. Foster used the sales comparison approach but employed the "price per unit" (not the price per acre) as the unit of comparison. He identified four properties (only one of which was in Henry County) that had previously been sold for "Senior Development", and for each he divided the sale price of the land by the number of "Approved Units" to yield a "Price Per Unit", ranging from $13,500 to $22,667 per unit (with the Henry County "comparable" having a $19,565 price per unit). By reference to these "comparable" sales, Mr. Foster then valued the Mill Road Tract under Falcon Design's concept plan to be worth $13,500 per unit. Mr. Foster multiplied the projected 677 units by the assumed price per unit of $13,500, and then subtracted the cost to connect public sewer to the Mill Road Tract ($147,000), to determine the value of the Mill Road Tract before donation of the easement in December 2016 to be almost $9 million—viz., $8,992,500, roughly $224,800 per acre. (This per-acre amount is obviously greater than the roughly $10,700-per-acre price that Mill Road Partners paid in mid-December 2014, the $10,770 effective price that Benwood Investments paid in late-December 2014, and the $25,800-per-acre effective price that MR36 Investments paid in September 2016.)

Mr. Foster concluded that the highest and best use of the Mill Road Tract *after* the easement donation was "uses allowed in the Deed of Easement", specifically "[i]n specified areas agricultural activity, low-impact outdoor recreation and education activities, and some hunting . . . and/or a public park." Once again using the sales comparison method, but this time with "price per acre" as the relevant unit of comparison,[13] Mr. Foster "after"-valued the Mill Road Tract (i.e., as

---

[13] Because the highest and best use of the Mill Road Tract "after" donation of the conservation easement is outdoor recreation, Mr. Foster determined his "after" value by deriving a value per acre from his suggested comparable properties and then multiplying the average per acre value times 33 acres.

**[\*21]** encumbered by the easement) to be worth $1,700 per acre, for an overall value of $56,032 ($1,700 per acre × 32.96 acres). However, Mr. Foster also concluded that the value of the 0.93-acre corner portion of the tract excluded from the conservation easement would be enhanced, and (using the sales comparison approach and price per acre unit of comparison) he estimated the value of the enhancement to be $2,418.

Altogether, Mr. Foster estimated the value of the Mill Road Tract easement (i.e., the forfeited value of developing an assisted living facility on the tract) to be $8,935,000. Mr. Carbonara reviewed Mr. Foster's appraisal report and professed at trial that he found it to be "conservative" (relative to other appraisals of conservation easements that he had seen) but nonetheless reasonable.

*Reporting the easement donation on Mill Road 36's 2016 return*

Mill Road 36 filed two returns for 2016, covering its two "short periods" for that year: one return covered the short period from January 1 through September 20, 2016 (the date on which MR36 Investments acquired its 97% interest in Mill Road 36), and the second return covered the short period from September 20 through December 31, 2016.[14] The returns were prepared by an accounting firm that obtained its information about Mill Road 36 and the easement contribution from Mr. Carbonara. Mill Road 36 reported its conservation easement donation on its return for the second short period. Attached to that return was Form 8886, "Reportable Transaction Disclosure Statement", as well as Form 8283, "Noncash Charitable Contributions". The attachment to Form 8283 recites that "[a] copy of the appraisal that substantiates these values . . . is filed with this Form 8283 and the donor's tax return." (As is stated above, the zoning staff's recommendation of approval is quoted in, and is attached as an addendum to, the appraisal.)

Both the Form 8283 and the Form 8886 explicitly disclosed the disparity between Mill Road 36's very low basis in the Mill Road Tract and the very high claimed value of the easement. The Form 8283 reported on line 5A that the property was acquired by "PURCHASE" in

---

[14] Mill Road 36 originally reported incorrectly, treating January 1 through December 29, 2016, as the first short period and treating December 29 through December 31, 2016, as the second short period. But Mill Road 36 later filed, on May 7, 2019, a Form 1065X, "Amended Return or Administrative Adjustment Request (AAR)", correcting the short period dates to end and begin on September 20, 2016.

[*22] August 2015 with "Donor's cost or adjusted basis" as $416,563"[15] and that it was contributed 16 months later on December 28, 2016, with an "Appraised fair market value" and "Amount claimed as a deduction" of "8,935,000", an amount equal to 20 times the reported basis.  On an attachment to the Form 8283, Mill Road 36 repeated:

> The determined fair market value of the conservation easement non-cash charitable contribution is $8,935,000 as of December 28, 2016 according to [appraiser] Ronald S. Foster . . . .  The property was acquired by Mill Road Henry 36 [sic], LLC on August 28, 2015 via transfer from related parties. . . .  The Donor's cost basis in the Property is $416,563 before the donation as reported on Form 8283.

The Form 8283 was signed both by Mr. Foster as the appraiser and by Katie Pace on behalf of SCT.

To similar effect, the Form 8886 attached to the return specifically called attention to the deduction claimed for the contribution of the conservation easement on the Mill Road Tract.  It reported the "Name of reportable transaction" on line 1a as "MILL ROAD HENRY 36 LLC – SYND CONSERV EASEMENT"; and on Schedule M–1, Statement 6, it reported "EXCESS VALUE OF NONCASH DONATION OVER BASIS" as "8,518,437".  On line 2 ("Identify the type of reportable transaction"), box "a" had been checked, indicating a "Listed" transaction; and on line 3 the "published guidance number for the listed transaction" was given as "2017-10".[16]

---

[15] The reported basis of $416,563, if attributed to the 39.68 acres, yields a basis of $10,498 per acre—an amount that corresponds roughly to the $10,700 per acre that had been paid by Mill Road Partners, which then contributed the 40-acre Mill Road Tract to Mill Road 36.  (If attributed only to the 32.96 acres in the easement per se, the total basis of $416,563 would have yielded instead a basis of $12,638 per acre, so we infer that Mill Road 36 reported its basis in the entire Mill Road Tract.)

[16] The IRS's Notice 2017-10, 2017-4 I.R.B. 544, 544, begins: "The Department of the Treasury (Treasury Department) and the Internal Revenue Service (IRS) are aware that some promoters are syndicating conservation easement transactions that purport to give investors the opportunity to obtain charitable contribution deductions in amounts that significantly exceed the amount invested.  This notice alerts taxpayers and their representatives that the transaction described in section 2 of this notice is a tax avoidance transaction . . . ."

**[\*23]** *IRS examination and FPAA*

The IRS selected Mill Road 36's partnership return for examination and assigned the examination to Revenue Agent Thomas Rikard. Agent Rikard's "Examining Officer's Activity Record" (Ex. 42-J) shows that on February 21, 2019, he "started the Penalty section" of his report; that on April 22, 2019, he "worked on the Penalties section" of his report; and that on April 23, 2019, he "completed the Penalties section". On May 28, 2019, he again considered the issue of penalties, prepared "Penalty lead sheets", and sent them "for . . . approval" to his immediate supervisor, Supervisory Revenue Agent Margaret McCarter. Over the next two months he discussed penalties with his supervisor and with an attorney from the Office of Chief Counsel, revised his penalty approval form, and prepared other penalty-related paperwork.[17] On August 5, 2019, Agent Rikard prepared a "Civil Penalty Approval Form" (Ex. 40-J) that listed, as its "Primary Position", the 40% gross valuation misstatement penalty of section 6662(h) (and listed, as an "Alternative Position", various 20% penalties under sections 6662 and 6662A). Supervisory Revenue Agent McCarter electronically signed the form on August 8, 2019, thereby attesting: "I approve the penalties identified above". On that same day she signed a "Supplemental Civil Penalty Approval Form" (Ex. 41-J), stating that she "first approved" the penalties on that date and that Agent Rikard had "first determined" the penalties "on 5/28/2019" (the date he first prepared "Penalty lead sheets"). Agent Rikard signed the supplemental form the next day, August 9, 2019. As of that time no communication had been made to petitioner about penalties. The first time that the IRS examiners communicated to petitioner about penalties was when Mr. Rikard mailed a copy of his report on September 24, 2019.

At the conclusion of the examination, the IRS issued to Mill Road 36, on June 11, 2020, an FPAA for the tax year ending December 31, 2016. The FPAA proposes to reduce Mill Road 36's charitable contribution deduction by $8,935,000. The FPAA explains that petitioner "failed to establish that the gift or contribution satisfied all

---

[17] Agent Rikard's activity record shows relevant entries dated 6/12/19 ("The agent prepared a Penalty package- LS-300, Supplemental form and Penalty write-Up. The agent completed the forms and sent it to GM [Group Manager, i.e., Supervisory Revenue Agent McCarter] for signature and approval. The agent called the GM to discuss the forms"); 7/3/19 ("The agent revisited the Penalty section and forms"); 7/10/19 ("The agent revised the penalty forms per GM"); 8/5/19 ("The agent prepared the penalty forms for the GM"); and 8/8/19 ("The agent and the GM reviewed . . . the Penalty write ups. The GM made suggestions for changes").

**[\*24]** the requirements of I.R.C. § 170 and the corresponding Treasury Regulations for deducting a noncash charitable contribution." In the alternative, the FPAA states that petitioner did not establish "that the value of the contributed property claimed . . . was greater than $510,400."

As to penalty, the FPAA asserts that the 40% penalty for a gross valuation misstatement, or in the alternative the 20% penalty either for a substantial understatement of income tax or for negligence, is applicable to Mill Road 36 pursuant to section 6662(a), (b), (c), (d), (e), and (h). The FPAA also asserts that the 20% penalty under section 6662A for underpayments of tax attributable to reportable transactions under section 6707A(c) is applicable to Mill Road 36. *But see infra* note 35.

*Tax Court proceedings*

MR36 Manager LLC, as TMP, timely filed in the Tax Court a petition to challenge the adjustment in the FPAA. After the trial of this case, the Commissioner filed an amended answer alleging that the section 6663 fraud penalty is applicable to Mill Road 36 for 2016, and that, in compliance with section 6751(b)(1), the initial determination of that penalty had been made by the Commissioner's counsel in this case, and that her initial determination had been approved in writing by her immediate supervisors. (Petitioner disputes the sufficiency of the Commissioner's compliance as to the fraud penalty; but because we conclude on other grounds that the fraud penalty should not be sustained, *see infra* Part VI.A, we do not discuss further its initial determination and supervisory approval.)

*The value of the Mill Road Tract easement*

The parties disagree as to the value of the Mill Road Tract easement. In preparation for trial, petitioner engaged James C. Clanton to value the Mill Road Tract easement (not Mr. Foster, who had done the appraisal for reporting the contribution on the tax return), and the Commissioner engaged Ray Kinney. We accept that both Mr. Clanton and Mr. Kinney are professional appraisers with sufficient expertise to value the conservation easement at issue. In doing so, both experts used the before-and-after method (as Mr. Foster had done).

**[\*25]** *Petitioner's expert, Mr. Clanton*

Mr. Clanton opined that "the highest and best use before the conservation easement would have been to sell the property to an experienced operator for them to develop the 33.89 +/− acre tract with a senior housing community", and he estimated the fair market value of the Mill Road Tract before the easement donation to have been $6,780,000. He made this estimate on the basis of four properties that had previously been developed as assisted living facilities that he determined were comparable to the Mill Road Tract, but in fact none of the four were in Henry County; rather all were in Gwinnett and Fulton Counties. Mr. Clanton opined that the highest and best use after the conservation easement "is to hold both tracts under the same ownership, obtain a variance for the Unencumbered Site. . . and improve the 0.93 +/− acre tract [in the northwest corner] with an owner-occupied, single-family residential dwelling", and he estimated the fair market value of the Mill Road Tract after the easement donation to be $80,000. Mr. Clanton estimated the value of the enhancement of the unencumbered portion of the Mill Road Tract as $5,000, and therefore concluded that the fair market value of the easement was $6,695,000 (about $2 million less than the deduction claimed on Mill Road 36's tax return).

*The Commissioner's expert, Mr. Kinney*

At trial Mr. Kinney opined that the highest and best use before the conservation easement "would have been as an investment property purchased for speculative assisted living development with a secondary fallback use as low density residential", and he estimated the value of the Mill Road Tract before the conservation easement to have been $990,000. He made this estimate on the basis of seven comparable sales, six of which were in Henry County. Similarly to Mr. Clanton, Mr. Kinney opined that "the highest and best use after imposition of the easement is for a single residential estate lot, or farmstead, with associated private recreational greenspace." Mr. Kinney estimated the value of the Mill Road Tract after the conservation easement to be $90,000, on the basis of four comparable sales of properties encumbered by conservation easements. Mr. Kinney therefore estimated the value of the Mill Road Tract easement to be $900,000 (as compared to Mr. Clanton's almost $6.7 million).

**[\*26]** *Our findings as to the value of the Mill Road Tract*

After due consideration of the expert reports and testimony offered by both parties, and for the reasons explained below in Part IV.B, we accept the conclusions of the Commissioner's expert Mr. Kinney. We find that the highest and best use of the Mill Road Tract before the easement donation was to hold the property for sale to an experienced developer, and that the corresponding value of the Mill Road Tract before the easement donation was $990,000 (i.e., about $24,750 per acre). We further find that the highest and best use of the Mill Road Tract after the easement donation is to develop the unencumbered portion of the Mill Road Tract as a single-family residential lot, and that the value of the Mill Road Tract after the easement donation is $90,000. The fair market value of the 33-acre Mill Road Tract easement was therefore $900,000.

## OPINION

### I.    *Burden of proof*

Rule 142(a)(1) provides that "[t]he burden of proof[18] shall be upon the petitioner, except as otherwise provided by statute or determined by the Court". Generally, the IRS's adjustments in an FPAA are presumed to be correct, and the taxpayer bears the burden of proving them wrong. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013). Petitioner thus generally bears the burden of proving Mill Road 36's entitlement to the charitable deduction for qualified conservation contributions under the applicable provisions of section 170, as well as the burden of proving the value of the conservation easement.

To show its entitlement to the charitable contribution deduction at issue, petitioner must prove (1) that Mill Road 36 made a qualifying contribution, (2) that it satisfied (or is excused from) the substantiation

---

18 As to burden of production, section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability *of any individual* for any penalty, addition to tax, or additional amount". (Emphasis added.) However, section 7491(c) does not apply to TEFRA partnership-level proceedings (such as this case). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Consequently, as a general rule, in a TEFRA partnership case the petitioner has not only the burden of proof but also the burden of production, even as to any penalty.

[*27] requirements for such a contribution, and (3) the value of the contribution. We discuss each of these issues in turn.

II. *Qualified conservation contributions*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property". § 170(f)(3)(A). That is, if someone owns property and donates to charity only a partial interest in that property, he may not claim a charitable contribution deduction for that donation. However, the statute provides an exception—and allows a deduction—for a "qualified conservation contribution". § 170(f)(3)(B)(iii). Section 170(h)(1) defines a "qualified conservation contribution" to be (1) the contribution of a "qualified real property interest," (2) to a "qualified organization," (3) "exclusively for conservation purposes." We examine each in turn.

A. *Whether Mill Road 36 donated a qualified real property interest*

Under section 170(h)(2)(C), a "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." Mill Road 36 donated to SCT a perpetual easement on the Mill Road Tract which expressly restricts its use of the property as specified in the easement deed, and accordingly meets the definition of a qualified real property interest in section 170(h)(2)(C).

The Commissioner, however, makes two principal arguments that Mill Road 36 did not donate a "qualified real property interest" within the meaning of section 170(h)(2). For the reasons explained below, we reject the Commissioner's contentions.

1. *Donative intent*

First, the Commissioner argues that Mill Road 36 lacked donative intent to make a gift because it was primarily motivated to monetize the federal income tax deduction for its investors. He points to the private placement memorandum circulated by Mr. Carbonara, as well as subsequent communications with investors, promising to prospective investors a tax benefit ratio of 4.25 times their investment in MR36 Investments. That is, he contends that Mill Road 36 was subjectively motivated not by disinterested generosity but by tax avoidance.

[*28] The Commissioner's contention as to Mill Road 36's subjective intent is defeated by the objective fact that a perpetual conservation easement on the Mill Road Tract was donated to SCT. Investors in MR36 Investments were presented with three strategic options for the Mill Road Tract and were given an opportunity to vote pursuant to the operating agreement. The investors were given an option between the possibility of future income or a present deduction, and they ultimately voted to forgo the possibilities of future capital appreciation and instead to donate a perpetual easement on the property and receive a present tax benefit. That federal income tax benefits are a consideration in determining whether to make a contribution does not undermine the validity of the contribution. It may be that the ideal donor does not let his left hand know what his right hand is doing, *see Matthew* 6:3, but section 170 does not insist on that ideal. Rather, a donor motivated by guilt, or by the hope of being admired, or by the desire for a tax benefit, may still deduct his contribution. Congress long ago decided to incentivize charitable contributions by allowing a deduction for those contributions, and it would be perverse indeed to deny a deduction to a donor simply because he had responded to the incentive. The Government may not "take[] away with the executive hand what it gives with the legislative". *Cross Refined Coal, LLC v. Commissioner*, 45 F.4th 150, 158 (D.C. Cir. 2022) (quoting *Sacks v. Commissioner*, 69 F.3d 982, 992 (9th Cir. 1995), *rev'g* T.C. Memo. 1992-526).

### 2. *The existence of the partnership*

Second, the Commissioner argues that the transfer of the Mill Road Tract to Mill Road 36 in August 2015 occurred before articles of organization for Mill Road 36 had been filed with Georgia's secretary of state, and that this mistake reflects inter alia "a lack of attention to detail and no intent to form a true partnership."

Although the Mill Road Tract was contributed to "Mill Road 36 Henry LLC" in August 2015 before its articles of organization had been filed with the Georgia secretary of state in December 2015, we do not view this irregularity to be fatal to Mill Road 36's legal right to donate a conservation easement to SCT in December 2016 (or its entitlement to a corresponding charitable contribution deduction for 2016). The filing of the articles is not decisive as to the existence of the entity. Under Georgia law, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit". Ga. Code Ann. § 14-8-6(a) (1995). Similarly, for federal tax purposes section 761(a) provides that "the term 'partnership' includes a syndicate, group, pool, joint venture

**[\*29]** or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not . . . a corporation or a trust or estate." The Supreme Court articulated in *Commissioner v. Culbertson*, 337 U.S. 733, 740 (1949) (quoting *Commissioner v. Tower*, 326 U.S. 280, 286 (1946)), the following standard for determining the existence of a partnership for federal income tax purposes:

> [A] partnership is created "when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." . . . A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income—capital or services.

But the Code's definition of a partnership in section 761(a) also includes joint ventures, which we have defined as "a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation,' and also as 'an association of persons to carry out a single business enterprise for profit.'" *Beck Chem. Equip. Corp. v. Commissioner*, 27 T.C. 840, 848–49 (1957) (quoting 48 C.J.S. *Joint Ventures* §§ 1–2).

We are satisfied that, at the time in August 2015 that the tract was contributed to Mill Road 36, it met the standard to be considered a valid partnership both under Georgia law and for federal income tax purposes. The initial operating agreement for Mill Road 36 was executed by Mr. Wang, Ms. Meng, and Benwood Investments on December 10, 2015, and provided for the members' contributions of cash, property, or services as well as their rights to share income, profits, and losses. Mill Road 36 was a venture undertaken by real estate professionals—Mr. Grant, Mr. Wang, Ms. Meng, and Benwood Investments—who knew each other well, dealt with each other regularly, and held themselves out as engaging in the real estate business through that entity for profit, and who in fact did engage in business for profit when in September 2016 the owners of Mill Road 36 sold 97% of their ownership interests in Mill Road 36 to MR36 Investments. Furthermore, articles of organization for Mill Road 36 were delivered to the Georgia secretary of state before the close of 2015 (the year of the contribution to Mill Road 36), and Mill Road 36 duly filed a federal income tax return for 2016. Accordingly, we hold Mill Road 36

**[\*30]** was lawfully engaged in business during 2016 as a bona fide partnership.

> B.  *Whether the easement satisfies an enumerated conservation purpose*

Section 170(h)(4)(A) provides that the term "conservation purpose" means:

> (i) the preservation of land areas for outdoor recreation by, or the education of, the general public,
> (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,
> (iii) the preservation of open space (including farmland and forest land) where such preservation is—
>> (I) for the scenic enjoyment of the general public, or
>> (II) pursuant to a clearly delineated Federal,
> State, or local governmental conservation policy,
> and will yield a significant public benefit, or
> (iv) the preservation of an historically important land area or a certified historic structure.

That is, the statute provides four potential qualifying purposes, the third of which ("preservation of open space") has two variants. "Under the statute, each of these four prongs is a conservation purpose in and of itself, and a taxpayer's satisfaction of one of these prongs suffices to establish the requisite conservation purpose." *Herman v. Commissioner*, T.C. Memo. 2009-205, 98 T.C.M. (CCH) 197, 200 (citing S. Rep. No. 96-1007, at 10 (1980), *as reprinted in* 1980-2 C.B. 599, 604).

As we explained in *Murphy v. Commissioner*, T.C. Memo. 2023-72, at \*42–43, in determining whether an easement satisfies a conservation purpose provided in section 170(h)(4)(A), we consider only those conservation purposes that are stated in the easement deed. Here, the easement deed for the Mill Road Tract states the following conservation purposes: first, the "protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem", under section 170(h)(4)(A)(ii); and second, the "preservation of open space" under section 170(h)(4)(A)(iii) that "yield[s] a significant public benefit" either (I) for the scenic enjoyment of the general public or (II) pursuant to a clearly delineated governmental conservation policy.

**[*31]**        1.        *Protection of a relatively natural habitat*

The Commissioner argues that the Mill Road Tract easement does not protect a significant relatively natural habitat within the meaning of section 170(h)(4)(A)(ii) and Treasury Regulation § 1.170A-14(d)(3)(i) because, according to him, "[d]eductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas". He points to the legislative history of section 170(h) to argue that "the habitat protection in section 170(h)(4)(A)(ii) applies to 'significant natural habitats and ecosystems' and not all habitats and ecosystems. H.R. Rep. No. 96-1108 (1980) p.11." The Commissioner proffered at trial the expert report of Dr. Martin Main, who "concluded that the conservation easement property does not provide a habitat for rare, endangered, or threatened species of animal, fish, or plants"; and the Commissioner relies on that report to assert that the Mill Road Tract easement does not protect a significant habitat or ecosystem. The Commissioner points out that petitioner's expert Christopher Wilson did not "see any endangered, rare, or priority species on the property. . . . Instead, he named 61 species of common birds and animals that he observed on the property, none of which are included on the Georgia State Wildlife Action Plan." According to the Commissioner, "protection of common species does not make a property a significant relatively natural habitat under section 170." However, we are influenced not only by petitioner's expert but also by the Baseline Report of SCT, the land conservancy.[19] The Commissioner's insistence on the presence of "high-quality"[20] habitats of threatened or rare species elevates the standard beyond the requirements of section 170(h)(4)(A)(ii).

We do not much resist the proposition that Dr. Main's opinion shows the absence of high-quality habitats of rare, endangered, or threatened species; but Congress did not determine to incentivize only

---

[19] We do not delegate to the donee the determination of whether the easement qualifies under section 170(h), but we do find its determination probative. There is no suggestion of collusion between donor and donee to support a false claim of conservation purposes. SCT's purpose for existence is to preserve properties with conservation values, and its conclusions merit consideration.

[20] *See* Commissioner's Opening Br. at 44, 122, 126 (Doc. 149). The phrase "high-quality" does not appear in section 170(h), nor in the pertinent regulations concerning "relatively natural habitat" or "open space". The phrase does appear in Treasury Regulation § 1.170A-14(d)(3)(ii), addressing "natural areas [not relevant here] that represent high quality examples of a terrestrial community or aquatic community".

**[\*32]** the preservation of "natural" or "high-quality" areas but rather to allow a charitable contribution deduction for the donation of an easement that has, as its "conservation purpose", "the protection of a *relatively natural* habitat of fish, wildlife, or plants, or similar ecosystem". § 170(h)(4)(A)(ii) (emphasis added). The added word— "relatively"—means "not absolutely". *Relatively*, *Webster's Third New International Dictionary of the English Language, Unabridged* (2002). We do not repeat here but we do follow our analysis in *Murphy*, T.C. Memo. 2023-72, at \*48–52, where we noted the distinctions between untouched wilderness areas, "natural areas"[21] that may be developed or disturbed to some extent, and "relatively natural" areas that may be even more altered but still retain conservation value. Consequently, our determination under section 170(h)(4)(A)(ii) does not depend on whether the Mill Road Tract is a wilderness area or is a "natural area" of "high quality" (evidently it is not) but on whether petitioner's contribution protects a "*relatively* natural habitat".

Commentary on the phrase "relatively natural habitat" from section 170(h)(4)(A)(ii) is given in Treasury Regulation § 1.170A-14(d)(3)(i), which provides:

> The donation of a qualified real property interest to protect a *significant* relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives will meet the conservation purposes test of this section. The fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state.

---

[21] *See* Treas. Reg. § 1.170A-14(d)(3)(ii) ("Significant habitats and ecosystems include . . . *natural areas* that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or *not intensely developed* where the coastal ecosystem is relatively intact; and *natural areas* which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area" (emphasis added)). As we explained in *Murphy*, "[s]uch a 'natural area' may be a full-blown 'wilderness area', but (the regulation indicates) it may also be 'included in . . . a local, state, or national park'—areas that sometimes include trails (sometimes paved), ski slopes and other recreational facilities, campgrounds (sometimes with sanitary facilities), cabins, and even hotels." *Murphy*, T.C. Memo. 2023-72, at \*50 & n.24.

**[*33]** (Emphasis added.) Proceeding from this addition of the word "significant", Treasury Regulation § 1.170A-14(d)(3)(ii)[22] provides the following standards for discerning what constitutes a significant habitat (with bracketed numbers interpolated):

> Significant habitats and ecosystems include, but are not limited to, [1] habitats for rare, endangered, or threatened species of animal, fish, or plants; [2] natural areas that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact; and [3] natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

The Commissioner's position stresses heavily the word "significant" but almost writes out of the regulation the phrase "but are not limited to". In this plain text of the regulation, relatively natural habitats "are not limited to" those with rare, endangered, or threatened species.

In *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033, 1036 (11th Cir. 2020), *vacating and remanding* T.C. Memo. 2018-146, the Eleventh Circuit—the presumptive venue for appeal in this case, *see supra* note 4—described the relation between the "relatively natural habitat" text in section 170(h)(4)(A)(ii) and the "significant relatively natural habitat" text in Treasury Regulation § 1.170A-14(d)(3)(i) as follows:

> [E]ven without the regulation, the Code would not be construed to apply to a completely trivial habitat—a few commonly occurring ants plainly would not do, nor would many other species not in need of conservation. Requiring some level of significance thus is unobjectionable. So long as the regulation's use of this term is not construed to mean

---

[22] Petitioner challenges the procedural validity of Treasury Regulation § 1.170A-14(d)(3)(ii) on the basis that the Secretary neglected to respond to a significant comment from the Ohio Conservation Foundation. However, because we hold that the Mill Road Tract easement satisfies each conservation purpose stated in its deed, we need not undertake an administrative law analysis of Treasury Regulation § 1.170A-14(d)(3)(ii) in this case.

**[\*34]** more than the Code will support, there is no reason to doubt the regulation's validity.

The Eleventh Circuit thus construes the regulation to connote "some level of significance" that is not "trivial". By that standard, the Commissioner's notion of "significan[ce]" is overstated.[23]

Similarly, the Commissioner's insistence that the Mill Road Tract must contain a high-quality habitat for rare or endangered animals or plants in order to satisfy the section 170(h)(4)(A)(ii) conservation purpose requires more than what is stated in the Code—"protection of a relatively natural habitat". Petitioner correctly points out that the Mill Road Tract contains the following "four habitats designated as high priority habitats by the Georgia [SWAP]: (1) Oak-Hickory-Pine Forest, (2) Bottomland Hardwood Forest, (3) Beaver Ponds, and (4) Streams." Because of the conservation easement, these habitats will continue to exist on the Mill Road Tract free from developmental interference. As the Mill Road corridor in Henry County continues to develop, the habitats on the Mill Road Tract will provide a haven for the natural ecological community of the Georgia Piedmont region and will exist there in a relatively natural state. Although petitioner relies on the expert report of Mr. Wilson, who observed on the Mill Road Tract five bird species of priority concern according to the Atlantic Coast Joint Venture Plan among 57 bird species of priority concern in the region, section 170(h)(4)(A)(ii) does not mandate that the "fish, wildlife, or plants, or similar ecosystem" be rare or threatened, nor does it specify a threshold number of species that must be present for the conservation purpose to be satisfied. Under the plain meaning of section 170(h)(4)(A)(ii), all that is required is that the easement protect "a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem". The Mill Road Tract easement protects plant communities and ecosystems natural to Henry County, which will continue to exist in a relatively natural state as the surrounding area is developed. We therefore hold that the Mill Road Tract easement satisfies the conservation purpose of section 170(h)(4)(A)(ii).

The Commissioner further argues that the easement is "not contiguous to a park, nature preserve, wildlife refuge, wilderness area,

---

[23] In this case we follow the precedent of the Eleventh Circuit, the presumptive venue for appeal in this case. *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). We need not consider whether the "relatively natural habitat" at issue here might fail to be "significant" under a more exacting standard.

[*35] or conservation area" and therefore "does not contain natural areas that are included in or contribute to the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or similar conservation area." Petitioner points out, however, that the easement "contributes to the ecological viability of the Walnut Creek watershed district". The easement deed establishes its riparian buffer to preserve the wetland ecosystem along the tributaries to Birch Creek present on the Mill Road Tract. Although the Commissioner counters that the easement merely recites the protections of streams provided by local law and thus "did not add any protection to the buffer abutting the property's stream", we disagree with the Commissioner because the protections provided by local law could become more relaxed in the future, whereas the protections provided in the easement deed will remain in perpetuity.

### 2. *Preservation of open space*

#### a. *Governmental conservation policy*

Petitioner argues that the easement preserves open space pursuant to the Georgia SWAP; the Georgia Forestry Commissioner's Urban Forest Priority Areas; the Henry County Comprehensive Plan; and the U.S. Department of Agriculture's policies for the conservation of productive farming soils. The Commissioner counters that the governmental conservation policies petitioner listed do not guarantee protection of the Mill Road Tract because it is not specifically mentioned or accepted into the policies. Although we accept that the Mill Road Tract easement preserves open space pursuant to the governmental policies petitioner identifies, we do not consider whether such preservation yields a significant public benefit because we are able more easily to hold that the Mill Road Tract easement provides a significant public benefit by providing the general public with a scenic view along Mill Road.

#### b. *Scenic view*

Petitioner asserts that the easement provides a scenic view for over 7,000 vehicles passing the Mill Road Tract every day, and that the easement's "forested viewshed protected by the Aesthetic Buffer in the Easement Deed will remain undeveloped in perpetuity." The Commissioner denigrates the value of this scenic view: "[T]he view of the property is neither unique nor significant; the view is mostly of pine trees, which is the same view as the view across the street, as well as

**[\*36]** along countless other roads in Henry County, Georgia." According to the Commissioner, this is insufficient for the Mill Road Tract easement to yield a significant public benefit. We disagree.

The Commissioner takes for granted that "the same view" that is offered by the Mill Road Tract to passers-by is now and will always remain available "along countless other roads in Henry County". But this ignores the fact, which the Commissioner admits, that the Mill Road Tract is "in an area of heavy commercial and residential development" and "has intensely developed subdivisions" on two sides. As an area evolves from fields and forests to neighborhoods and then to shopping centers, the value of stands of pine trees along some of the roads becomes greater.

As the general public commutes along Mill Road in the years ahead, it will benefit from a stretch of open space pine forest more than from another stretch of the continuing development (whether strip malls or residential subdivisions). The easement deed ensures that this forested view will exist in perpetuity along Mill Road, and the significance of the public benefit will only increase as Henry County becomes more developed and Mill Road becomes more heavily traveled. We therefore hold that the Mill Road Tract easement meets the "open space" conservation purpose of section 170(h)(4)(A)(iii)(I).

### 3.    *The size of the Mill Road easement*

For both the "relatively natural habitat" issue and the "open space" issue, the Commissioner points to the small size of the easement as evidence that it lacks conservation value. As to "relatively natural habitat", he argues that "[t]he property is not a high-quality example of any habitat because of the property's small size . . . . [A]t 0.05 square miles, Partnership's conservation easement was too small for purposes of conservation." The Commissioner acknowledges "that size is not completely determinative if the area contains special places or a valuable habitat" but insists the property has nothing valuable on it. "Because only the small 'special natural area' on the property is protected from agriculture and forestry, . . . only about half of the already-small property is protected, which amounts to only approximately 0.025 square miles[, which is] . . . too small to be a significant relatively natural habitat." As to "open space" giving a "scenic view", the Commissioner cites Treasury Regulation § 1.170A-14(d)(4)(ii)(B), which, he acknowledges, provides that "visual (rather than physical) access to or across the property by the general public is

[*37] sufficient" and that "the entire property need not be visible to the public" but also (he stresses) that "the public benefit from the donation may be insufficient to qualify for a deduction if only a small portion of the property is visible to the public"; and he argues that the easement involves only a "small parcel of land . . . with only a 0.25-mile view". The Commissioner essentially contends that the Mill Road easement is too small to have a conservation purpose.

The easement area is 33 acres[24] of the 40-acre Mill Road Tract. Admittedly, this is not Yellowstone, with its 2.2 million acres. But in a suburban setting, an easement covering 33 acres is hardly negligible. It may be illuminating to compare the Mill Road easement not to Yellowstone but instead to something like the 50-acre Boston Common,[25] which is the oldest and one of the best known city parks in the United States. The Mill Road easement area is about two-thirds the size of the Boston Common. Both the Boston Common and the Mill Road Tract are irregular in shape, so for simplicity in comparing them we assume that each is a square. If it were square, the Boston Common (50 acres, or about 0.08 square miles) would be, on each side, about 1,475 feet (less than a third of a mile but more than a fourth of a mile), with a perimeter of about one and one-tenth miles. The Mill Road easement (33 acres, or about 0.05 square miles) would be, on each side, about 1,200

---

[24] The Commissioner argues that the 33-acre size of the easement must be discounted: "Because only the small 'special natural area' on the property is protected from agriculture and forestry, . . . only about half of the already-small property is protected, which amounts to only approximately 0.025 square miles[, or 16 acres, which is] . . . too small to be a significant relatively natural habitat." Petitioner shows, however, that this Special Natural Area is in fact 61% of the easement area (i.e., 20 acres). More important, we think the Commissioner's discount is unwarranted because the entire 33 acres is protected from development, and the 39% of the tract outside the Special Natural Area supports the conservation values of that area. *Cf. Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1039 ("It is true, as the Commissioner notes, that the knotweed exists on only a limited proportion of the easement—perhaps 7%, with the capacity to occupy up to 17%. But the knotweed that exists, whatever its proportion, is worthy of protection").

[25] In order to visualize and consider the size of the Mill Road easement, we make this comparison to the Boston Common because it is a well-known property of which we can take judicial notice. We do not make the comparison because we think Boston is equivalent to Henry County, nor because we think that a city park is equivalent to private property in a suburb, nor because we have decided that the Boston Common necessarily, within the meaning of section 170(h), has a "relatively natural habitat" or constitutes a qualifying "open space". The Common simply illustrates that a 50-acre tract is sufficiently large to have a profound effect on the character of its developed surroundings. We think the same could be true for a 33-acre tract.

**[\*38]** feet (a little less than a fourth of a mile and a little more than a fifth of a mile), with a perimeter of about nine-tenths of a mile. An undeveloped area, even on this modest scale—and especially when surrounded by development in an urban or suburban setting—can be a noteworthy and beneficial feature.

We assume that there could be a tract so small that it could not support any qualifying conservation purpose ("a completely trivial habitat", in the words of *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036)—suppose, for illustrative purposes, a highway median strip, or perhaps an empty 0.1-acre lot in a residential neighborhood. But in determining that the Mill Road easement is not so small that it lacks conservation values, we are influenced by SCT's Baseline report. "Oak-Hickory-Pine Forest is considered the climax forest of the Piedmont . . . . The [p]roperty is 61% oak-hickory forest that is being designated a Special Natural Area." The Commissioner's insistence of a requisite size for a conservation easement, like his arguments about "high-quality" habitats, lacks any basis in the statutory text. The fact that 33 acres of land containing natural plant communities and ecosystems will remain undeveloped among a rapidly developing area is sufficient under section 170(h)(4)(A)(ii).

Our conclusion that a pine tree forest along a highway can constitute "open space . . . for the scenic enjoyment of the general public, . . . yield[ing] a significant public benefit", *see* § 170(h)(4)(A)(iii)(I), is not altered by the fact that the preserved view in this case is not longer than a quarter mile. The regulation does warn that "the public benefit from the donation may be insufficient to qualify for a deduction if only a small portion of the property is visible to the public", Treas. Reg. § 1.170A-14(d)(4)(ii)(B); but in this case that "portion" is the entire northern boundary of the tract along Mill Road, slightly longer than a fourth of the property's entire circumference. Even a quarter-mile respite from development alters the character of the neighborhood. If sprawl moving south from Atlanta is otherwise unchecked, the perpetual presence of the pine forest on at least this portion of Mill Road may for many be a welcome relief from the strip malls, shopping centers, and residential subdivisions. The Mill Road easement substantially benefits the public by preserving a scenic view of this quarter-mile forest.

**[*39]** C.    *Whether the easement protects its conservation purposes in perpetuity*

Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity", and we explained in *Belk v. Commissioner*, 140 T.C. 1, 12 (2013), *supplemented by* T.C. Memo. 2013-154, *aff'd*, 774 F.3d 221 (4th Cir. 2014), that "the section 170(h)(5) requirement that the conservation purpose be protected in perpetuity is separate and distinct from the section 170(h)(2)(C) requirement that there be real property subject to a use restriction in perpetuity."

Because a "qualified conservation contribution" can be a donation of a partial interest in property, § 170(f)(3)(B)(iii), a donor of a conservation easement may reserve in the easement deed rights permitting it to make continued use of the property. However, to be entitled to a charitable contribution deduction for donation of a conservation easement, Treasury Regulation § 1.170A-14(b)(2) requires that "[a]ny rights reserved by the donor in the donation of a perpetual conservation restriction must conform to the requirements of this section [i.e., Treasury Regulation § 1.170A-14]". As we explained in *Murphy*, T.C. Memo. 2023-79, at *60–61, Treasury Regulation § 1.170A-14(d), (e), and (g) taken as a whole provides that a donor (1) may reserve in the easement deed rights to make continued use of the easement property, provided that there are enforceable restrictions to prevent uses inconsistent with conservation purposes, (2) may continue pre-existing use of the easement property that does not conflict with the conservation purposes of the gift, and (3) cannot use the property in a way that would destroy other significant conservation interests (unless pursuant to protecting the conservation purpose of the easement).

The Commissioner argues that "the reserved rights in the easement deed permit uses that would destroy those conservation purposes." Specifically, the Commissioner complains of the reserved right to engage in forestry and agriculture, as well as the right to construct park structures and trails, on portions of the easement.

We agree with petitioner, however, that the reserved rights in the easement deed do not undermine its conservation purposes. The aesthetic buffer provided in the easement deed preserves the scenic view of the Mill Road Tract along Mill Road in perpetuity. The easement deed gives enhanced protection to special natural areas on the Mill Road Tract, specifying that all construction must take place outside of the

[*40] special natural areas. If the reserved rights were exercised to the fullest extent allowable under the easement deed, we think that the Mill Road Tract easement would still fulfill its stated conservation purposes. But it must be kept in mind that there are no reserved rights that are unconditional; that is, even expressly reserved rights are made subject to the condition that they "are not inconsistent with the Purpose of this Conservation Easement". If a conservation purpose were to be threatened by the exercise of a reserved right, the easement deed gives SCT the right to monitor and prevent the exercise of that reserved right.[26] We hold that the reserved rights do not interfere with the protection of the conservation purposes in perpetuity.

III. *Compliance with the substantiation requirements*

"A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." § 170(a)(1). The Commissioner contends that there are two defects in Mill Road 36's compliance with those requirements; but to put these alleged defects into perspective, we first summarize the requirements and then discuss each of these two defects in turn.

A. *A summary of the requirements*

Section 170(f)(11) imposes, for charitable contribution deductions, heightened substantiation requirements on taxpayers, depending on the value of the contribution.[27] Section 170(f)(11)(A)(i) provides that for

---

[26] If SCT were to fail to enforce the terms of the easement deed, then "the Attorney General or the district attorney of the circuit in which the major portion of trust property lies shall represent the interests of the beneficiaries and the interests of this state as parens patriae in all legal matters pertaining to the administration and disposition of such trust." Ga. Code Ann. § 53-12-174 (2010).

[27] In the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 155(a)(1) and (2), 98 Stat. 494, 691—an uncodified statutory provision—Congress directed the Secretary to issue regulations under section 170(a)(1) "which require any individual, closely held corporation, or personal service corporation claiming a deduction under section 170" greater than $5,000 to "obtain a qualified appraisal for the property contributed," "attach an appraisal summary to the return on which such deduction is first claimed for such contribution," and "include on such return such additional information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations." In response to DEFRA's directive, the Secretary added paragraph (c) to Treasury Regulation § 1.170A-13. But in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 883(a), 118 Stat. 1418, 1631, Congress added paragraph (11) to subsection (f) of section 170 to "extend[] to all C corporations the present and prior law requirement, applicable to an individual,

**[\*41]** deductions greater than $500,000, a taxpayer must attach "a description of such property", § 170(f)(11)(B), obtain "a qualified appraisal of such property", § 170(f)(11)(C), and "attach[] to the return for the taxable year a qualified appraisal of such property", § 170(f)(11)(D).

Treasury Regulation § 1.170A-13(c)(3)(ii) provides that a "qualified appraisal" must contain, inter alia, the following information: (1) a description of the property; (2) the date(s) on which the property was appraised; (3) the property's fair market value; (4) the method used to value the property; and (5) the specific basis for the valuation and a justification of that basis.

Treasury Regulation § 1.170A-13(c)(3)(i)(B) provides that a qualified appraisal must be "prepared, signed, and dated by a qualified appraiser". A "qualified appraiser" must (1) hold himself out to the public as an appraiser; (2) be qualified to make appraisals of the type of property being valued; and (3) acknowledge that aiding and abetting an understatement of tax liability may subject them to a penalty pursuant to section 6701. Treas. Reg. § 1.170A-13(c)(5)(i). Moreover, a qualified appraiser cannot be one who (1) receives a deduction under section 170 for the contribution of the property that is being appraised, (2) was a party to the donor's acquisition of the property being appraised, (3) is the donee of the property, (4) was a person employed by any of the aforementioned, (5) is related to any of the aforementioned within the meaning of section 267(b) (not applicable here), or (6) is an appraiser regularly engaged by any of the aforementioned who does not make a majority of his appraisals for other persons during the taxable year. *Id.* subdiv. (iv).

B.    *The two supposed defects*

Mill Road 36 did have an appraiser and an appraisal, but the Commissioner asserts that its substantiation had two fatal defects—i.e., (1) the appraiser was not qualified because Mill Road 36 "had knowledge of facts that would cause a reasonable person to expect the appraiser

---

closely-held corporation, personal service corporation, partnership, or S corporation, that the donor must obtain a qualified appraisal of the property if the amount of the deduction claimed exceeds $5,000." Staff of J. Comm. On Tax'n, 108th Cong., General Explanation of Tax Legislation Enacted in the 108th Congress, JCS-5-05, at 462 (J. Comm. Print 2005). "The Act also provide[d] that if the amount of the contribution of property . . . exceeds $500,000, then the donor (whether an individual, partnership, or corporation) must attach the qualified appraisal to the donor's tax return." *Id.*

**[\*42]** [Mr. Foster] falsely to overstate the value of the donated property", *see id.* subdiv. (ii), and (2) two necessary persons in addition to Mr. Foster failed to "sign[] the qualified appraisal and appraisal summary", *see id.* subdiv (iii). For the reasons we now explain, we conclude that Mill Road 36's substantiation did not have these defects.

1.      *Whether Mill Road 36 "had knowledge of facts"*

Treasury Regulation § 1.170A-13(c)(5)(ii) provides that an appraiser is not qualified if "the donor [here, Mill Road 36] had knowledge of facts that would cause a reasonable person to expect the appraiser [here, Mr. Foster] falsely to overstate the value of the donated property". Reading this regulation carefully, we observe that it is not the appraisal that may become disqualified, but rather the appraiser. We furthermore observe that the appraiser does *not* become disqualified simply because (1) the appraiser incompetently or carelessly overstated the value, and/or (2) the donor knew that the appraiser overstated the value, and/or (3) the donor knew facts *about the property* that caused the value to be overstated. Rather, this disqualification occurs when the donor knows facts that do or should cause him to expect the appraiser to falsely overstate the value. Such facts will be facts about the appraiser, and the resulting expectation is not just an incorrect overstated value but a "falsely" overstated value. Thus, Treasury Regulation § 1.170A-13(c)(5)(ii) provides the following as an illustration: "[T]he donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property". Of course, such an agreement would be a fact about the appraiser that is known to the donor; and a valuation known to be in excess of fair market value but agreed to nonetheless would be not just an incorrect amount but a culpably "false[]" overstatement of value.

The Commissioner urges us away from this close reading of the regulation and asks us to read it "more broadly", but we decline to do so. The Code elsewhere imposes consequences for overstated value (e.g., disallowance of the overstated deduction) and even for grossly overstated value (e.g., the 40% penalty we discuss below in Part VI.B), and the regulatory text we construe here is manifestly focused on something beyond that: a taxpayer-donor's knowledge of an appraiser's deception. As we stated in *Kaufman v. Commissioner*, T.C. Memo. 2014-52, at \*70–71 (footnote omitted), *aff'd*, 784 F.3d 56 (1st Cir. 2015):

**[\*43]** We take from the example and from the modification of the infinitive "to overstate" by the adverb "falsely" in the regulations that the expression "falsely to overstate" is intended to convey a sense of collusion and deception as to the value of the property. While we will state shortly our finding that [the taxpayers] lacked reasonable cause and did not act in good faith . . . we do not believe that, as we interpret the term, Mr. Hanlon [the appraiser] acted falsely with respect to his appraisal of the facade easement. We find that he was a qualified appraiser within the meaning of section 6664(c)(2)(A). That is not to say that he was right or that petitioners did not have reason to question his valuation; it is only to say that, with respect to the technical meaning of the term "qualified appraiser", he was qualified.

The Commissioner argues that Mr. Carbonara (as exclusive owner of the managing member of Mill Road 36 and its TMP) and Mr. Grant (as prior managing member of Mill Road 36 and engager of Mr. Foster's appraisal) had knowledge of facts that would cause Mr. Foster's appraisal to be unqualified, but many of the facts the Commissioner relies on are beside the point for this purpose.

The Commissioner points to facts about the Mill Road Tract that were known to Mr. Grant and Mr. Carbonara and that do indeed undermine the value petitioner claimed and deducted (that the tract had not been formally approved for an assisted living facility; that the concept plan inflated the number of units that could fit on the tract; and that "Messrs. Carbonara and Grant knew the price of vacant land zoned RA in Henry County was nowhere near $271,086 per acre ($8,935,000 / 32.96 [acres]) because they were buying and selling it at per acre prices between $3,730 and $19,483 per acre"); but these facts, without more, do not show any "false"-ness or deception by Mr. Foster.[28] One fact known to Mr. Grant and Mr. Carbonara that the Commissioner fairly presses to undermine the valuation is that, contrary to the express assumption in Mr. Foster's valuation, the county zoning officials had *not* approved the building of an assisted living facility on the Mill Road Tract but had only recommended it. Given that Mr. Foster had been

---

[28] Mr. Foster signed the Form 8283 on which (as we discuss below in Part VI.A involving the fraud penalty) Mill Road 36's low basis was frankly juxtaposed with the high claimed value. The opportunity for "deception" in such a circumstance would be complicated.

**[\*44]** given the letter (which included a "Recommendation" of "recommend[ed] Approval"), quoted it, and attached it to his appraisal, it is hard to account for the error. We think it most likely that Mr. Foster simply did not realize that his statement was incorrect and that he mistook the recommendation for an "approval". It also seems likely that Mr. Grant and Mr. Carbonara shared his carelessness on the point because of their not unreasonable belief that approval would ultimately be given if requested and their ignorance and lack of curiosity about state-level approval.

Some facts that the Commissioner cites about the appraisals (such as the number of similar appraisals in Henry County at the same time) do indeed undermine their probative value and may come closer to being facts known to Messrs. Grant and Carbonara that might suggest some deception by Mr. Foster. But the testimony of Mr. Grant (who was called by each of the two parties as part of its case in chief and whose testimony about his business dealings we generally found to be credible) establishes that Messrs. Grant, Foster, and Carbonara were not as closely related to each other as the Commissioner seems to assume. Their interests overlapped but did not perfectly coincide. Mr. Grant had hired Mr. Foster for appraisals and had hired Falcon Design for concept plans since long before he met Mr. Carbonara, sold land to him, or anticipated conservation easements. Mr. Grant explained that it was not unusual for him to hire Mr. Foster for multiple appraisals at the same time. Mr. Grant also hired other appraisers as well as other concept designers in the ordinary course of his business, and Mr. Foster and Falcon Design had clients other than Mr. Grant. Mr. Grant's business is to acquire land, obtain a concept plan for the land, have the property appraised with that concept plan, and then sell that development opportunity to an experienced developer (or else form a joint venture with them), an activity for which he found Mr. Foster and Falcon Design to be useful and credible. Mr. Grant explained that whether the buyer might be a developer or a contributor of the property, he maximizes the number of units in a concept plan because he negotiates his sale prices using a per unit value. In this case that buyer was Mr. Carbonara, who when negotiating the purchase price of the Mill Road Tract wanted to reduce the number of units in the concept plan to 508 to lower the price at which MR36 Investments could buy it. If Mr. Carbonara had been successful in reducing the number of units in the concept plan, then presumably Mr. Foster would have accordingly determined a lower value of the Mill Road Tract in his appraisal, which would have correspondingly reduced the amount of the deduction for donation of the conservation easement. Mr. Grant and Mr. Carbonara

**[\*45]** both evidently hoped for economies of scale, and we do not think that this disqualified Mr. Foster or his appraisals. Neither Mr. Grant nor Mr. Foster was a recipient of the deduction for contributing the Mill Road Tract easement to SCT.

In short, Mr. Foster is a professional appraiser who held himself out to the public as such, was qualified to appraise property with an assisted living facility concept plan, is not excluded under the provisions of Treasury Regulation § 1.170A-13(c)(5)(iv), and made the statement acknowledging that he could be subject to penalty pursuant to section 6701. We therefore hold that he was a "qualified appraiser" under Treasury Regulation 1.170A-13(c)(5) and that his appraisal of the Mill Road Tract easement was a "qualified appraisal" under Treasury Regulation 1.170A-13(c)(3).[29]

### 2. *Whether necessary signatures are missing*

The Commissioner also complains that Janet Gaskin and David Miller contributed to Mr. Foster's appraisal of the Mill Road Tract easement but did not sign the appraisal, in supposed violation of Treasury Regulation § 1.170A-13(c)(5)(iii), which provides: "[I]f two or more appraisers contribute to a single appraisal, each appraiser shall comply with the requirements of this paragraph (c), including signing the qualified appraisal and appraisal summary". However, we are persuaded by the testimony of Ms. Gaskin that she and Mr. Miller were employees of Mr. Foster, and that Mr. Foster guided and supervised their work and made all material determinations for appraising the Mill Road Tract easement such that he is the qualified appraiser required by Treasury Regulation § 1.170A-13(c)(3)(i)(B) to sign the appraisal, and that the regulation does not also require the signatures of the subordinates who assisted him. Although Ms. Gaskin and Mr. Miller assisted Mr. Foster in the preparation of his appraisal report, there is (in the words of *Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at \*40) "no indication in the record that any of the figures in the appraisal report were [their] own."

---

[29] That is, the evidence in this case does not establish that Mill Road 36 had knowledge of facts that would cause a reasonable person to expect Mr. Foster falsely to overstate the value of the donated property—a fact-intensive inquiry that is inherently case-specific. This is not a case in which the evidence shows that the donor provided a valuation that was endorsed by the appraiser, though both knew that the valuation contradicted the appraiser's professional judgment.

**[\*46]** IV.   *The value of the easement donation*

   A.   *The method of valuing a conservation easement*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the "fair market value" of the property at the time of the donation.  Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  With respect to valuing a donation of a partial interest in property, Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the fair market value of the partial interest at the time of the contribution." And Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements.  If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction.

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record.  *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).  In this case we do not have "a substantial record of sales of easements comparable to the donated easement", and we will

**[\*47]** therefore base our valuation on the before and after method. *See* Treas. Reg. § 1.170A-14(h)(3)(i). To do so—

> If before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

*Id.* subdiv. (ii); *see also Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986). A property's highest and best use is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". *Olson v. United States*, 292 U.S. 246, 255 (1934).

To show the value of the conservation easement, including the property's highest and best use before and after the donation, the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand the evidence that will determine a fact in issue", and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

Having established the subject and method of valuation, as well as the scope of evidence with which to do so, we will now explain the basis of our valuation of the Mill Road Tract easement as stated above in the findings of fact.

[*48]  B.    *The value of the Mill Road Tract easement*

As with Mr. Foster's appraisal made at the time of the contribution, the parties' expert witnesses at trial applied the following criteria for analyzing the highest and best use of the Mill Road Tract: the use must be physically possible, legally permissible, financially feasible, and maximally productive.  Of these four criteria, the one in sharpest dispute is whether an assisted living facility of the kind and magnitude provided in the concept plan would be "legally permissible" on the Mill Road Tract.  Legally permissible uses are those "that are not precluded by law, zoning ordinances[,] or private deed restrictions." Furthermore, both experts valued the Mill Road Tract using the sales comparison approach.  That is, once an asserted highest and best use of property is deemed to be, inter alia, legally permissible, the property can then be valued on the basis of sales of comparable properties put to that same use.  "The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership."  Both experts agree that fair market value assumes a hypothetical sale between a willing buyer and a willing seller. For the reasons explained below, we disagree with Mr. Clanton's determinations with respect to highest and best use of the Mill Road Tract and comparable sales before the easement donation, and we therefore do not accept his valuation.  We instead accept Mr. Kinney's valuation of the Mill Road Tract easement as its fair market value in December 2016.

1.    *Legal permissibility*

a.    *County approval*

Mr. Clanton states that "the legally permissible uses are typically determined by the zoning constraints of the jurisdiction in which the property is located", and he then references Henry County Code of Ordinances Section 4.03.18 (stated in the recommendation letter for conditional approval by the Henry County Zoning Advisory Board). Mr. Clanton's report makes the extraordinary assumption "that developing the 33.89 +/− acres with a senior housing community, to a maximum of 677-units, would be legally permitted by zoning".  We think it is reasonable for Mr. Clanton to assume (and the Commissioner's expert Mr. Kinney does not disagree) that the staff's recommendation to approve conditional use to operate a 677-unit assisted living facility had a good chance of being followed in due course by Henry County Planning

**[\*49]** and Zoning, and the application, if left pending, would have been granted by "zoning"—i.e., by the county authorities.

However, although the Henry County Planning and Zoning staff did recommend that the Zoning Advisory Board approve conditional use for the Mill Road Tract as an assisted living facility, once that recommendation was communicated, the application was withdrawn, thereby forestalling further county-level consideration. Henry County had a finite capacity for such facilities, and withdrawing the application for the Mill Road Tract was practically necessary in order to enable the staff to consider equivalent applications for Mr. Grant's ten other tracts. But this meant that, after the withdrawal of the application for the Mill Road Tract, the Mill Road Tract no longer had any assurance of county approval. If a later-filed application for another tract received a staff recommendation of approval for conditional use and then (unlike the Mill Road Tract) proceeded to final Board approval, then the final approval of that other tract might impede or prevent such approval for the Mill Road Tract. Someone considering a purchase of the Mill Road Tract for development as an assisted living facility could hardly be indifferent to the withdrawal of the application, and Mr. Clanton's extraordinary assumption "that developing . . . a senior housing community. . . would be legally permitted by zoning"—even just at the County level— was unwarranted on the facts as they existed at the time of the appraisal and of the contribution.

b.     *State approval*

Moreover, Mr. Clanton does not mention the definition of "assisted living facility" provided in Georgia's ULDC, Appendix A (also referenced in the county staff's recommendation letter), which requires approval and licensure by the Georgia Division of Healthcare Facilities. Although Mr. Clanton's report makes the extraordinary assumption "that developing the 33.89 +/− acres with a senior housing community, to a maximum of 677-units, would be legally permitted by zoning", this assumption addresses only zoning approval from Henry County and does not address approval from the Georgia Division of Healthcare Facilities to operate an assisted living facility of the magnitude provided in the concept plan.

Mr. Kinney rejects any assumption that a 677-unit assisted living facility would have ultimately been licensed by the Georgia Division of Healthcare Facilities because his market research indicated that a capacity of 677 units in an assisted living facility was grossly excessive

[*50] and that the appropriate capacity for an assisted living facility was between 60 and 120 units. According to Mr. Kinney's market research, a 677-unit facility would have to "include numerous levels of care ranging from independent living through hospice", which would thereby fail the criterion provided in the recommendation letter for conditional use that the facility meet the requirements of ULDC, Appendix A, which specifically excludes hospice and intensive care from the uses of an assisted living facility.

Mr. Clanton's valuation (and petitioner's general assertion that the highest and best use of the Mill Road Tract before the easement donation) therefore makes an unreasonable assumption that a 677-unit assisted living facility would ultimately have been approved by the Georgia Division of Healthcare Facilities and licensed to operate on the Mill Road Tract. The Henry County staff's recommendation letter for conditional approval of an assisted living facility on the Mill Road Tract specifically incorporates the definition of "assisted living facility" provided in Appendix A to ULDC Chapter 4, which requires such a facility to be "state-licensed". Accordingly, a mere recommendation that a 677-unit assisted living facility be approved by the Henry County Zoning Advisory Board, is insufficient when such a facility also requires a "certificate of need" and a permit to operate, issued by the Georgia Division of Healthcare Facilities. Mere county approval (much less mere recommendation of such approval) by itself does not sufficiently establish that such an assisted living facility is a legally permissible use of the Mill Road Tract before the donation of the conservation easement. Petitioner has thus failed to show that a 677-unit assisted living facility was a legally permissible use of the Mill Road Tract, and this failure gravely undermines the highest-and-best-use assumption in its valuation.

However, even if the highest and best use had been as Mr. Clanton asserted, the value could not have been more than a fraction of what he concluded, for the reasons we now discuss.

2. *Sales comparables*

Apart from the problems of his highest-and-best-use assumption, Mr. Clanton's valuation faces additional problems: He determined his before value on the basis of four sales of properties that he considered comparable to the Mill Road Tract. However, none of these properties is in Henry County. We accordingly do not accept them as properly comparable to the Mill Road Tract.

**[\*51]** Moreover, Mr. Clanton states in his report that "[u]nder the Principle of Substitution, the value of a property can be estimated at the cost of acquiring an equally desirable substitute."[30] This sensible and intuitive principle undermines Mr. Clanton's valuation of the Mill Road Tract, because a willing buyer would not have paid approximately $197,550 per acre ($6,695,000 / 33.89 acres) for non-unique land in Henry County when the price per acre for substitute properties (identified by the Commissioner's expert Mr. Kinney) was between $6,000 and $10,000 per acre. The price of substitute land in Henry County upon which an assisted living facility could be developed reveals that the high values determined by both the original appraiser Mr. Foster ($8,935,000) and the trial expert Mr. Clanton ($6,695,000), even if they were in some sense valid, would be attributable not to the underlying Mill Road Tract but instead to the finished development of the property as an assisted living facility. But petitioner has not shown that the particular qualities of the Mill Road Tract made it uniquely suitable for an assisted living facility. Mr. Grant himself found 10 other properties on which such a facility could be built—and no one defended the idea that demand existed in Henry County for 11 such facilities. The regulation sensibly instructs us to make "an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed," Treas. Reg. § 1.170A-14(h)(3)(ii); and in light of the high number of available properties just as suitable as the Mill Road Tract, one cannot say that there was a high likelihood that the Mill Road Tract would have been developed into an assisted living facility—and one can say that there was a zero probability that it would have been developed if the selling price had been $6.7 million or any other remotely similar price.

A developer intending to build a facility would never have contemplated buying the Mill Road Tract for $6.7 million but would instead have bought one of the many other tracts available at much lower prices. As a prospective developer would do, we view the price of a comparable undeveloped lot in Henry County as the proper "substitute" by which to value to the Mill Road Tract. Mr. Kinney's

---

[30] *See Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) ("In the case of vacant, unimproved property the 'market data' or 'comparable sales' approach is generally the most reliable method of valuation, the rationale being that the marketplace is the best indicator of value, based on the conflicting interests of many buyers and sellers. This in turn is based on the principle of substitution, *i.e.*, that a prudent man will pay no more for a given property than he would for a similar property").

**[\*52]** valuation of $900,000 was based on such comparables, and we adopt his valuation.

### 3. *Sales history of the Mill Road Tract*

But we need not look even as far away as other comparable properties to see that Mr. Clanton's appraisal was very wide of the mark. The sales history of the Mill Road Tract itself is powerful evidence of its value. Mr. Kinney's valuation is commensurate not only with those comparables but also with the sales history of the Mill Road Tract itself (and Mr. Clanton's is not). Mill Road Partners initially purchased 117.5 acres (comprising a 50-acre tract and a 67.5-acre tract) along Mill Road on December 12, 2014, for $1.25 million (just below $10,700 per acre). Less than three weeks later on December 30, 2014, Benwood Investments acquired a 25% undivided interest in the two parcels for $315,000 (i.e., a one-fourth interest for approximately one-fourth of Mill Road Partners' $1.25 million purchase price). After Mill Road Partners and Benwood Investments later contributed the 40-acre Mill Road Tract to Mill Road 36 as its only asset, a 97% ownership interest in Mill Road 36 was sold to MR36 Investments in September 2016 for $1 million (i.e., at a profit). The $1 million sale price (equivalent to about $25,800 per acre) reflects what Mr. Carbonara's MR36 Investments considered the Mill Road Tract to be worth. Mr. Clanton argues that the reason the ownership interests in Mill Road 36 were sold for less than the appraised fair market value of the Mill Road Tract was that "investors who acquire non-controlling interest in marketable securities, in entities with the primary asset being undeveloped land, require a significant discount"; but Mr. Grant testified that he considered the sale of the interests in Mill Road 36 to MR Investments to be a sale of the Mill Road Tract, and it was on that basis that he negotiated the sale price with Mr. Carbonara. Altogether, it is reasonable that an easement covering 33 acres of a non-unique 40-acre tract (approximately 82% of the area) worth $1 million would be valued (as the Commissioner accepts) at $900,000 (about $27,230 per acre)[31] as opposed to $6,695,000 (i.e., the

---

[31] To avoid an unintended comparison of apples (40 acres) and oranges (33 acres), we note that MR36 Investments effectively purchased the 40-acre tract for $25,800 per acre in September 2016, that it conveyed through Mill Road 36 an easement of 33 acres in December 2016, and that it claims a deductible value totaling about $203,000 per acre for that 33-acre easement. We see no evidence that the Mill Road Tract octupled in value between September and December 2016.

**[\*53]** value asserted by petitioner, which amounts to about $203,000 per acre).[32]

V.     *The amount of the allowable charitable contribution deduction*

Generally the amount of a donor's charitable contribution deduction is the value of the property contributed.  *See* Treas. Reg. § 1.170A-1(c)(1).  If that generality applied here, then the amount of the deduction would be the value we have determined for the easement, i.e., $900,000.  However, the Commissioner argues that the Mill Road Tract "was inventory in the hands of the contributing partners"—Mill Road Partners and Benwood Investments—when it was contributed to their partnership Mill Road 36, and that accordingly the amount of Mill Road 36's deduction is limited to its basis in the Mill Road Tract pursuant to section 170(e)(1)(A).  For the reasons we explain below, we agree with the Commissioner and accordingly hold that Mill Road 36's deduction for its contribution to SCT of the Mill Road Tract easement is limited to its basis in the Mill Road Tract—$416,563.[33]

---

[32] Mr. Grant did explain that he generally sells land to developers for a price below its appraised value (though for more than what he paid for it, so as to enjoy a profit) not because the appraisal is wrong but because he wants the below-appraised-value list price to signal to the buyer-developer the profit potential of the property.  But this approach, however reasonable it may be in Mr. Grant's regular business, does not account for the pricing in the sale to MR36 Investments of the 97% interest in Mill Road 36 (whose only asset was the Mill Road Tract) where the appraised value of that tract was $8.9 million.  The gross disparity between the $1 million price and petitioner's $6.7 million and $8.9 million appraisals certainly cannot be explained as one of Mr. Grant's modest mark-downs to encourage a buyer.  Mr. Grant and Mr. Carbonara had friendly business relations, but there is no reason to suppose that Mr. Grant intended to let Mr. Carbonara's MR36 Investments pay him only $1 million for a property reasonably appraised at $6.7 million or $8.9 million.  Rather, the sale for $1 million is evidence that these higher appraised values bore no relation to the tract's actual fair market value.  In that transaction the evidence of fair market value was the sale price—the amount that a willing buyer (Mr. Carbonara) paid to a willing seller (Mr. Grant).

[33] The Commissioner asserts that petitioner's "charitable contribution is limited to its adjusted basis in the property, which was $416,563"; and he does not make any argument (based on section 170(e)(2), Treasury Regulation § 1.170A-14(h)(3)(iii), or otherwise) that the deduction should be further limited by allocating that basis between the easement acreage and the other acreage or between the easement and the underlying land.  We do not attempt any such allocation on our own motion.

**[*54]** A. *Special rules for inventory property*

Section 170(e)(1)(A) reduces the amount of a taxpayer's charitable contribution deduction by "the amount of gain which would not have been long-term capital gain . . . if the property contributed had been sold by the taxpayer at its fair market value." Section 724(b), titled "Contributions of Inventory Items", requires the partnership (here Mill Road 36) to treat as ordinary income or loss "any gain or loss recognized by the partnership on the disposition of such property during the 5-year period beginning on the date of such contribution." Section 724(b) applies to property that was "contributed to the partnership" (as the Mill Road Tract was contributed to Mill Road 36) "by a partner" (as the Mill Road Tract was contributed by Mill Road Partners and Benwood Investments) and that was an "inventory item" in the contributing partner's hands immediately before the contribution. Section 724(d)(2) incorporates the definition of "inventory item" provided in section 751(d)—i.e., that

> the term "inventory items" means—
> > (1) property of the partnership of the kind described in section 1221(a)(1),
> > (2) any other property of the partnership which, on sale or exchange by the partnership, would be considered property other than a capital asset and other than property described in section 1231, and
> > (3) any other property held by the partnership which, if held by the selling or distributee partner, would be considered property of the type described in paragraph (1) or (2).

Section 1221(a)(1) (cross-referenced in section 751(d)(1), as quoted above) excludes from the definition of a capital asset, inter alia, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Likewise, subsection (b)(1)(A) and (B) of section 1231 (cross-referenced in section 751(d)(2)) exempts "property . . . properly includable in the inventory of the taxpayer" and "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" from being included in the calculation of a taxpayer's section 1231 hotchpot gain or loss.

Accordingly, if property was held by a contributing partner primarily for sale in the ordinary course of his trade or business, then

**[\*55]** for the partnership that received the property it was an "inventory item" within the meaning of section 724(b), and disposition of that property by the receiving partnership would result in ordinary income or loss to the partnership. If instead the receiving partnership were to contribute such an "inventory item" to charity, and that contribution were to give rise to a deduction under section 170, then subsection (e)(1)(A) would reduce the partnership's deduction by the amount of ordinary gain that would have been recognized had the partnership sold the property. We recently analyzed and applied these provisions in our opinion in *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2023-82, *supplementing* T.C. Memo. 2020-148.

B.    *The Mill Road Tract as inventory*

The Eleventh Circuit—the appellate venue in *Glade Creek* and presumptively in this case as well—uses the following inquiries to determine whether a taxpayer holds property for sale in the ordinary course of business or as an investment: (1) whether the taxpayer was engaged in a trade or business, and if so, what business; (2) whether the taxpayer was holding the property primarily for sale in that business; and (3) whether the sales contemplated by the taxpayer were "ordinary" in the course of that business.[34] *Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984) (citing *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980)). Mill Road Partners and Benwood Investments were the two partners who contributed the Mill Road Tract to Mill Road 36. Both entities were previously and subsequently engaged in the business of buying and selling real estate; they acquired

---

[34] To resolve these three inquiries, the Eleventh Circuit consults seven relevant factors:

> (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.

*United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir. 1969). We need not analyze in detail each of these factors here because it is evident from the testimony of Mr. Grant that he himself, Benwood Investments, Ms. Meng, and Mr. Wang all worked together in the business of buying and selling land, and that the Mill Road Tract was both acquired and sold within the ordinary course of their real estate business operated through Mill Road 36.

**[\*56]** the 117-acre parent tract that included the Mill Road Tract pursuant to their real estate business; and they contributed 40 acres of it—the Mill Road Tract—to Mill Road 36 in furtherance of their real estate business. And as we found above at page 10, after Mill Road Partners contributed 40 of the 117 acres to Mill Road 36, Mill Road Partners used the remaining acres in the ordinary course of their real estate business by selling the other parcels to Evergreen Management Group and 49 Mill Road Henry, LLC.

The fact that 97% ownership of Mill Road 36 was then sold to MR36 Investments (after the Mill Road Tract was contributed to Mill Road 36 and before Mill Road 36 made the easement donation) does not change the fact that the Mill Road Tract was contributed to Mill Road 36 by partners (Mill Road Partners and Benwood Investments) who were real estate professionals within five years of donating the conservation easement and claiming the charitable contribution deduction.

Accordingly, pursuant to section 724(b), any proceeds from the *sale* of the Mill Road Tract would have been ordinary income to Mill Road 36 at the time the conservation easement was donated; and the amount of the deduction that was generated by the charitable *contribution* that was made (instead of a sale) is limited, by operation of section 170(e)(1)(A), to Mill Road 36's basis in the Mill Road Tract. It is undisputed that Mill Road 36's basis in the Mill Road Tract at the time of the conservation easement donation was $416,563, as it reported on its Form 8283. Mill Road 36 is therefore entitled to a charitable contribution deduction not of the almost $9 million amount it claimed on its return, nor the $6.7 million value for which it contended at trial, nor even the $900,000 value we find for the easement, but its basis of $416,563.

VI. *Penalties*

The Commissioner asserts that Mill Road 36's deduction of the Mill Road Tract easement contribution is subject to the fraud penalty under section 6663, or, in the alternative, an accuracy-related penalty under section 6662.[35] For the reasons explained below, we hold that not

---

[35] The Commissioner also asserts a reportable transaction understatement penalty under section 6662A. However, in *Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80, 103 (2022), we held the imposition of the reportable transaction understatement penalty on conservation easements pursuant to Notice

[*57] the 75% fraud penalty but rather the alternative 40% gross valuation misstatement penalty under section 6662(h) (to the extent the deduction claimed exceeded $900,000) and the 20% negligence or substantial understatement penalty under section 6662(b)(1) or (2) (to the extent the deduction claimed exceeded basis of $416,563 but did not exceed $900,000) are applicable to Mill Road 36.

A.    *Section 6663 fraud penalty*

1.    *General fraud penalty principles*

Section 6663(a) imposes a penalty "equal to 75 percent of the portion of the underpayment which is attributable to fraud."  However, "[i]n any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary", § 7454(a), "and that burden of proof is to be carried by clear and convincing evidence", Rule 142(b).  As we explained in *Parks v. Commissioner*, 94 T.C. 654, 660–61 (1980):

> To satisfy his burden of proof, . . . [the Commissioner] must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.

As we have explained, "fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. . . .  The intent to conceal or mislead may be inferred from a pattern of conduct." *Niedringhaus v. Commissioner*, 99 T.C. 202, 210–11 (1992).  Facts that show this "intent to conceal or mislead" are called "badges of fraud", and the often-quoted non-exclusive list of such badges tallies them as follows:

> (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false W–4's; (8) failure to make estimated tax payments;

---

2017-10 was invalid because Notice 2017-10 was issued without the notice and comment required by the Administrative Procedure Act.  *See* 5 U.S.C. § 553.

**[\*58]** (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity.

*Id.* at 211.

## 2. *Liability for the fraud penalty*

The Commissioner contends that the section 6663 fraud penalty is applicable here because Mill Road 36 "through its managers, Daniel Carbonara and Jeff Grant, intended to evade a tax known or believed to be owing through an intent to mislead". However, for the reasons we explain below, we disagree with the Commissioner as to the applicability of the section 6663 fraud penalty.

## a. *Disclosure*

Important to our determination that the fraud penalty is not applicable is Mill Road 36's express disclosure on its tax return of the principal facts about the easement contribution. Charitable contribution deductions under section 170 are subject to a robust regime of substantiation and reporting requirements under section 170(f)(11), which requires a taxpayer claiming a deduction greater than $500,000 to provide information about the property being contributed, to attach a completed appraisal summary, and to attach a qualified appraisal. § 170(f)(11)(A)–(D). Under Treasury Regulation § 1.170A-13(c)(4)(ii), the appraisal summary required to be included with the taxpayer's return must include, among other things, the following information: (1) the date the donor acquired the property; (2) the cost or other basis of the property; and (3) the date the donee received the property. *Id.* subdiv. (ii)(D), (E), (G). We have explained the reason for these requirements:

> The requirement to disclose "cost or adjusted basis," when that information is reasonably obtainable, is necessary to facilitate the Commissioner's efficient identification of overvalued property. . . . Unless the taxpayer complies with the regulatory requirement that he disclose his cost basis and the date and manner of acquiring the property, the Commissioner will be deprived of an essential tool that Congress intended him to have.

*Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*17.

**[\*59]** But here Mill Road 36 placed that "essential tool" squarely in the Commissioner's hand. As we found above at Part III.B, Mill Road 36 strictly complied with the substantiation and reporting requirements of section 170(f)(11) by attaching to its return Form 8283 that confessed the disparity between its very low basis in the Mill Road Tract (reported to be $416,563) and the very high claimed value of the easement (claimed to be $8,935,000, an amount equal to 20 times the reported basis). Mill Road 36's return also included Form 8886 that reported the deduction claimed for the contribution of "SYND CONSERV EASEMENT" that yielded "EXCESS VALUE OF NONCASH DONATION OVER BASIS" in the amount of "8,518,437".

We do not see conduct meant (in the words of *Parks*) to "conceal" or "mislead". This is not an instance in which a taxpayer buried an improper deduction deep in his return, nor even a case where the taxpayer relegated his disclosure of an improper deduction on a self-composed attached statement,[36] which no one at the IRS might ever understand or even see. Rather, the conservation easement transaction was fully disclosed, in exactly the manner designed by the Treasury itself to reveal charitable contribution deductions based on overstated value. And in this instance, the substantiation and reporting requirements of section 170(f)(11) appear to have functioned exactly as intended by Congress: Mill Road 36 donated a conservation easement on property it owned and claimed a corresponding charitable contribution deduction; it attached all necessary information to its tax return as required by the Code and regulations, the purpose of which is to alert the Commissioner to potential overvaluations of charitable gifts; the Commissioner was accordingly alerted to the disparity between Mill Road 36's basis in the Mill Road Tract and the value of the conservation easement claimed as a deduction; he determined to examine Mill Road 36's tax return; and an overvaluation of the charitable contribution has been determined. We think Mill Road 36's compliant reporting was starkly at odds with an intention to conceal.

---

[36] *Cf. Maciel v. Commissioner*, 489 F.3d 1018, 1026–27 (9th Cir. 2007) (finding taxpayer failed to report income from the sale of a business, and his accountant attached to his return a statement that may have "provide[d] the IRS with a hint about omitted income" but did "not mention [his entities] by name, nor [did] it explain that [the taxpayer] sold his partnership share during the tax year and earned a profit on the transaction"), *aff'g in part, rev'g in part* T.C. Memo. 2004-28.

**[\*60]**          b.      *Badges of fraud*

The Commissioner argues, however, and we assume it is true, that "fraud is not precluded as a matter of law because a transaction is disclosed,"[37] and he argues that the facts of the case show fraud notwithstanding disclosure.  The Commissioner does not rely on the 11 "badges" listed above (and indeed those 11 are not perceptible here); but he posits instead other indicia of fraud—an approach that is certainly permissible, since the list of 11 "badges of fraud" given above is non-exclusive.  But of course to be an indicium of fraud, a fact must show not mere error but an "intent to conceal or mislead".  The Commissioner maintains that in this case fraud is shown by the following five other badges of fraud.  *See* Corrected Simultaneous Opening Br., at 179 (Doc. 149):

(1)      "[T]he pattern used by Messrs. Carbonara and Grant in at least 10 other SCEs in Henry County contemporaneous with Partnership's SCE".  Indeed, the apparent replication of the Mill Road 36 contribution in ten other equivalent syndications is certainly evidence that the approach taken by Mill Road 36 was deliberate and knowing.  If there were any question whether the inflated deduction for the Mill Road Tract easement was accidental, then the other ten instances would help to answer that question with a no.  But the other ten instances do not show that the Mill Road Tract deduction was fraudulent.  That someone does eleven similar deals does not, in itself, prove that one or all of them were fraudulent.  If one deal is proved fraudulent, then perhaps the pattern is evidence that the other deals may have been fraudulent, too.  But we do not view the multiplicity of deals per se as a badge of fraud.

(2)      "Partnership's deliberate overvaluing of the conservation easement".  The Commissioner states that "[d]eliberately misvaluing an asset can constitute clear and convincing evidence of fraud", for which

---

[37] *See* Doc. 156 at 134.  For this proposition, the Commissioner cites *Maciel v. Commissioner*, 489 F.3d at 1027 (discussed *supra* note 37), and cites (without a "pinpoint" to a specific page) *Wegbreit v. Commissioner*, T.C. Memo. 2019-82, *aff'd*, 21 F.4th 959 (7th Cir. 2021)—apparently because, in that case, "[f]or 2008 [the taxpayers] . . . included a Form 8886 disclosing their DAT transaction".  T.C. Memo. 2019-82, at \*41.  This quotation is the entirety of what the opinion says about the disclosure of the transaction.  However, the relevant effect of the DAT transaction in that case appears to have arisen in 2006 (the actual year of the transaction), not 2008 (the year of the disclosure), and the case involves five taxable years, multiple issues, and multiple moving pieces.  The significance of the "disclos[ure]" in *Wegbreit* is not at all clear.

**[\*61]** proposition it cites as support our opinion in *Estate of Trompeter v. Commissioner*, T.C. Memo. 2004-27, 87 T.C.M. (CCH) 851, *aff'd in part, rev'd in part and remanded*, 170 F. App'x 484 (9th Cir. 2006). However, *Trompeter* is unhelpful authority to cite when arguing for fraud notwithstanding disclosure, because what *Estate of Trompeter*, 87 T.C.M. at 875, actually states is:

> [T]he coexecutors' willing and conscious *failure to disclose* to [the Commissioner] the assets of the estate, *coupled with their deliberate undervaluation* of some of the assets which were disclosed to [the Commissioner], constitutes clear and convincing evidence of fraud deserving of the section 6663 penalty.

(Emphasis added.) The Code does impose a penalty on overvaluation notwithstanding disclosure, and that penalty—in an amount up to 40%—is in the accuracy-related underpayment penalty regime under section 6662. Since Mill Road 36's overvaluation is expressly disclosed in compliance with the reporting regimes that were applicable here (and results in imposition of the enhanced 40% penalty), then on the facts of this case we do not think that the overvaluation itself also warrants the 75% fraud penalty.

(3) "Partnership's purported reliance on an appraisal containing multiple false statements and fraudulent analysis". The principal defects in Mr. Foster's appraisal on which Mill Road 36 based the claimed deduction were his stated assumption that "[t]he property *is approved* for 677 Senior Assisted Living Units" and his valuation of the property on a per unit-basis (rather than a per-acre basis) based on non-comparable properties. But while we think that these definite errors were surely negligent, we are not persuaded, by "clear and convincing evidence", Rule 142(b), that they were fraudulent in the context of this transaction, i.e., Mr. Grant's real estate business in which he often developed a concept plan and hired Mr. Foster to assume that plan and appraise a property for sale to a developer.

Since Mr. Grant generally did not involve himself in the actual development of a project, his purposes were usually satisfied with a concept plan that seemed to be in the realm of reason. He left it to the prospective purchaser-developer to decide whether the project was actually feasible and to work out the actual problems of getting final approval for zoning variances and obtaining any necessary permits. Once he had a buyer, Mr. Grant was on to the next project. In the case

**[\*62]** of the properties designated for assisted living facilities, he similarly contented himself with a concept plan plausible to himself and a recommendation from the zoning staff. Mr. Foster accepted Mr. Grant's concept plan and its number of units and valued the property by reference to "comparable" properties that did exist and to their "per-unit" prices that were arithmetically correct. Mr. Foster's per-unit price of $13,500 for the Mill Road Tract was in fact less than the $19,565 per unit price that he derived for the nearest of his four "comparables". Mr. Foster's valuation using the per-unit (not per-acre) price was explicitly set out in the appraisal attached to the return.

If someone actually interested in developing an assisted living facility had stepped forward as a prospective buyer, Mr. Grant's method of doing business would have left it to the buyer to do his own due diligence about the number and value of units that might actually be possible and to get final zoning approval and whatever other county or state permits or licensing that would have been required. Mr. Grant's approach (and Mr. Foster's corresponding valuation) would have been completely unsatisfactory for someone purchasing property with a plan of actually building an assisted living facility—but that was not Mr. Grant's plan. Rather, his plan was to sell the property to such a developer. Mr. Grant did not purport to know much about assisted living facilities nor, for his purposes, did he need to know much about them.

Mr. Carbonara had a perspective similar in some respects to Mr. Grant's: Mr. Carbonara did not know much about assisted living facilities and did not plan to build one. He had no incentive to study the zoning rules referenced in the zoning staff's recommendation nor to notice that their definitions incorporated state rules he had not investigated. And though the per-unit method in the appraisal yielded a value woefully at odds with the principle of substitution, its arithmetic was correct, a licensed appraiser had validated it, and it was disclosed on the appraisal attached to the return. This yielded gross error, but we cannot say it was fraud.

(4) "[L]ack of credibility in testimony". The actual concrete facts underlying most of the issues in this case were largely undisputed, and most in fact were stipulated. This is not a case in which witnesses were sharply cross-examined about income amounts or expenditures. Rather, the process by which the various entities were formed; the manner in which and the purpose for which the Mill Road Tract was acquired; the amounts of dollars that changed hands; the contents of the

**[\*63]** deed, appraisal documents, and tax filings; the communications with customers about tax benefits—all these were confirmed by Mr. Grant and Mr. Carbonara, who did not deny that the tract had been valued at multiples of its then-recent acquisition cost.

But as a proffered "badge of fraud", the Commissioner cites against them five instances (only two of them in fact "testimony") of "Implausible Testimony and Factual Misstatements". *See* Corrected Simultaneous Opening Br., at 195–98 (Doc. 149). These consisted of (1) Mr. Carbonara's erroneous pretrial statement (corrected at trial) that he had never received a Schedule K–1, "Partner's Share of Income, Deductions, Credits, etc.", from "Emerald Acquisition entities"; (2) Mr. Carbonara's stating at trial his opinion that Mr. Foster's $8.9 million appraisal was "conservative"; (3) Mr. Carbonara's incorrect testimony about the determination of the call price of options for the membership units of MR36 Investments; (4) Mr. Carbonara's pretrial statements that the zoning application for the tract had been approved (rather than merely recommended for approval); and (5) Mr. Grant's and Mr. Carbonara's reliance on the appraisal that incorrectly stated that a zoning application had been approved (rather than merely recommended for approval).

The first two of these five are not especially significant to the issue of fraud. The third undermined Mr. Carbonara's credibility, but it involved a fact (concerning the call price) that was not in itself critical to the case and was settled by reference to documents that Mr. Carbonara admitted. The fourth and fifth involved the distinction (thoroughly discussed in this opinion) between a zoning staff recommendation and actual zoning approval. As we indicated in Part IV.B.1 above, this can be an important distinction for determining the highest and best use of a piece of property.

(5) "[A] lack of bona fide business transactions that hide the true nature of the transaction." The "lack of bona fide business transactions"[38] to which the Commissioner points as a badge of fraud is

---

[38] To this point, the Commissioner adds the observation that Mr. Carbonara spread his 11 Henry County cases around five places of trial. Rule 140(a) provides: "Request for Place of Trial: When filing a petition, the petitioner must also file a separate paper requesting the place of trial. See Form 5 (Request for Place of Trial) shown in the Appendix. . . . The Court will make reasonable efforts to conduct the trial at the location most convenient to that requested if suitable facilities are available and will notify the parties of the place at which the trial will be held." For this case the

**[\*64]** equivalent to the defects he alleged to dispute the existence of a true partnership, which we addressed above in Part II.A.2. By definition, a charitable contribution lacks a profit motive, but that lack does not invalidate the contribution nor deprive the donor of his deduction, nor does it suggest fraud.

Mill Road 36 can certainly be criticized for its tax reporting; and, as we explain below, it *will* be penalized. But on the facts of this case we cannot hold that *fraud* has been proved by clear and convincing evidence. The evidence does not establish an attempt by Mill Road 36 to conceal or deceive in the Commissioner's administration of tax collection, and accordingly we hold that the section 6663 fraud penalty is not applicable to Mill Road 36 for 2016.

B. *Section 6662 accuracy-related penalty*

1. *General accuracy-related penalty principles*

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty "on the underpayment of tax required to be shown on a return . . . equal to 20 percent of the portion of the underpayment to which this section applies" upon a taxpayer who underpays his tax because of, inter alia, "[n]egligence or disregard of rules or regulations", a "substantial understatement of income tax", or a "substantial valuation misstatement". An understatement of income tax is substantial if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or $5,000. § 6662(d)(1)(A). For 2016, the year at issue, a substantial valuation misstatement exists if "the value of any property . . . claimed on any return . . . is 150 percent or more of the amount determined to be the correct amount of such valuation". § 6662(e)(1)(A). None of these penalties will be imposed where the taxpayer had "reasonable cause". § 6664(c)(1).

---

requested place of trial was Columbia, South Carolina. In the other 10 cases, petitioner requested Atlanta, Georgia; Birmingham, Alabama; Knoxville and Nashville, Tennessee. The Commissioner asserts that Mr. Carbonara did so "to obfuscate and conceal the pattern of his 'Contemporaneous SCE Enterprise in Henry County.'" (We cannot tell whom the Commissioner is quoting when he uses (in quotation marks) the phrase "Contemporaneous SCE Enterprise in Henry County".) Since both the Commissioner and the Court have means for coordinating the handling of related cases, even in different geographical areas, we do not see how this practice was oriented toward obfuscation. We can imagine benign reasons for Mr. Carbonara or his counsel to attempt to prevent 11 cases from ending up on the same trial calendar.

**[\*65]** One possible ground for claiming "reasonable cause" is reliance on professional advice. Treas. Reg. § 1.6664-4(b)(1). Instructed by Treasury Regulation § 1.6664-4(c), we have held that reasonable cause based on reliance on an adviser exists where (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

However, in the case of a "gross valuation misstatement"—i.e., where the value of property claimed on the return is 200% or more of the amount determined to be the correct valuation—the rate of the accuracy-related penalty is increased to 40%, § 6662(h)(1) and (2)(A)(i), and there is no "reasonable cause" defense available, § 6664(c)(3).

On the basis of these principles, the record in this case, and the valuation we determined above in Part IV.B, we will now determine which penalties are applicable with respect to Mill Road 36's donation of the Mill Road Tract easement.

### 2. *Liability for an accuracy-related penalty*

Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination . . . ." "The Commissioner's noncompliance with section 6751(b) is a partnership-level defense[, and] [p]arties in a partnership-level case may raise noncompliance with section 6751(b)(1) as a defense." *Rogers v. Commissioner*, T.C. Memo. 2019-61, at \*22. Petitioner has disputed the Commissioner's compliance with the supervisory approval requirement of section 6751(b)(1) with respect to the accuracy-related penalties under section 6662 determined in the FPAA. We will therefore address whether the Commissioner complied with section 6751(b) in making his penalty determination.

Agent Rikard first proposed a penalty in the "lead sheet" that he prepared on May 28, 2019—which he sent to his immediate supervisor that same day "for . . . approval". Thereafter, as he made revisions (sometimes at her direction), he continued to discuss penalties with her. By August she was evidently ready to approve a penalty, and he prepared the appropriate approval form on August 5, which she signed on August 8, 2019—before any communication about a penalty had

**[\*66]** been made to Mill Road 36.  Petitioner does not dispute this chronology.

Section 6751(b)(1) arose from "Congress' belief that penalties should not be used to gain inappropriate leverage over taxpayers, but 'should only be imposed where appropriate and not as a bargaining chip.' S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601." *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 7 (2020).  From that perspective, Agent Rikard's handling of penalty determinations was exactly as Congress intended.  He worked over a period of months to get his supervisor's approval before approaching Mill Road 36 about penalties.

Petitioner contends otherwise and insists that the supervisory approval was untimely under section 6751(b)(1).  Petitioner contends that Agent Rikard made his "initial determination . . . [p]rior to August 5, 2019," and that, because the supervisor did not approve it until three days later on August 8, 2019, the approval did not comply with section 6751(b)(1).  As counsel expressed the point at trial, petitioner contends that "the initial determination should be signed by the supervisory Revenue agent contemporaneously and . . . the initial determination should not proceed [i.e., precede] that approval."  This contention fails.

If petitioner were correct that section 6751(b)(1) requires that the supervisory approval be "contemporaneous" with the initial determination, apart from any communication to the taxpayer, then a taxpayer might defeat the penalty by showing an agent's initial determination on August 5 and a supervisor's approval on August 8.  But the statute does not state any such requirement, and no court has so interpreted it.  On the contrary, it seems inevitable that the agent's initial determination must precede the supervisor's approval of it, and a three-day approval period seems unobjectionable when no communication with the taxpayer takes place.

The Tax Court has held that

> [t]he 'initial determination' of a penalty . . . must be a formal act with features resembling those that a 'determination' itself displays. . . . [T]he 'initial determination' of a penalty assessment will be embodied in a formal written communication to the taxpayer, notifying him that the Examination Division has completed its work and has made a definite decision to assert penalties.

**[\*67]** *Belair Woods*, 154 T.C. at 10. No such "formal written communication" was issued to Mill Road 36 before August 5, 2019, and petitioner does not contend otherwise. Moreover, the Eleventh Circuit, viewing the statute differently, has held "that the IRS satisfies [s]ection 6751(b) so long as a supervisor approves an initial determination of a penalty assessment before it assesses those penalties." *Kroner v. Commissioner*, 48 F.4th 1272, 1276 (11th Cir. 2022) (citing *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020)), *rev'g and remanding* T.C. Memo. 2020-73. Under the facts of this case, it is undisputed that the section 6662 penalties were approved before the issuance of the revenue agent's report, and therefore before the issuance of the FPAA, and therefore before any penalty assessments (which have yet to take place). Whether following the Tax Court's reasoning (exemplified in *Belair*) or the different reasoning of the Court of Appeals for the Eleventh Circuit (set out in *Kroner*), we must conclude that the Commissioner satisfied the supervisory approval requirements of section 6751(b)(1) with respect to the section 6662 penalties at issue.

3. *Whether Mill Road 36 is liable for an accuracy-related penalty*

a. *TEFRA jurisdiction for penalties*

Section 6221, as in effect at the relevant time, provided generally that, in a TEFRA partnership case, "the applicability of any penalty . . . which relates to an adjustment to a partnership item . . . shall be determined at the partnership level." Section 6226(f) likewise states that our jurisdiction in TEFRA partnership cases is limited to "the applicability of any penalty . . . which relates to an adjustment to a partnership item." Treasury Regulation § 301.6221-1(c) further provides that "[p]artnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty . . . other than partner-level defenses". And Treasury Regulation § 301.6226(f)-1(a) provides that "the court has jurisdiction in the partnership-level proceeding to determine any penalty . . . that relates to an adjustment to a partnership item. However, the court does not have jurisdiction in the partnership-level proceeding to consider any partner-level defenses to any penalty . . . that relates to an adjustment to a partnership item." Accordingly, within our jurisdiction in this TEFRA case is the ability to determine the applicability of any section 6662 penalty; but to the extent that defenses (such as reasonable cause) to any penalties would depend on the particular aspects of a partner-

**[\*68]** level return, we do not have jurisdiction in this TEFRA case to consider them.

### b. *40% penalty for gross valuation misstatement*

Mill Road 36 originally claimed on its partnership return a charitable contribution deduction of $8,935,000 for its donation of the Mill Road Tract easement, and in Part IV.B above we determined the correct deduction to be $900,000. Mill Road 36 therefore overstated on its return the value of the Mill Road Tract easement by much more than 200%, and accordingly the 40% penalty under section 6662(h) for a gross valuation misstatement is applicable. *See* § 6662(e)(1)(A), (h)(2)(A)(i). That is, to the extent the understatement of income tax is attributable to disallowing the portion of the deduction above $900,000, the 40% penalty rate applies rather than the 20% rate (and no reasonable cause defense exists).

### c. *20% penalty as to substantial understatement*

To the extent that the understatement of income tax is attributable solely to the character of the Mill Road Tract as inventory, it is *not* "attributable to one or more gross valuation misstatements". § 6662(h)(1). Instead, the portion of the disallowance attributable solely to the inventory issue is $483,437, which is the difference between the value of the donated easement (i.e., $900,000) and the allowable deduction equal to basis (i.e., $416,563). Any understatement of income tax attributable to that portion of the disallowance that is substantial under section 6662(b)(2) (i.e., any understatement that "exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000", § 6662(d)(1)(A)) is subject to penalty, if at all, at the 20% rate of section 6662(a).

However, a reasonable cause exception exists to the imposition of a penalty under section 6662, § 6664(c)(1), and one basis for claiming reasonable cause is reasonable reliance in good faith on the advice of a professional tax adviser, Treas. Reg. § 1.6664-4(c). Petitioner raises this reasonable cause defense on the basis that Mr. Carbonara relied on "the advice of [his] advisors, including (1) the advice and opinion of experienced and competent tax counsel [the law firm Bryan Cave, LLP], (2) the experience and expertise of their qualified appraiser [Mr. Foster] who prepared a qualified appraisal, (3) the advice and preparation services of a reputable accounting firm [Carr, Riggs & Ingram], and (4) the guidance of an established land trust [SCT, the donee]." In

**[\*69]** support of this reasonable cause defense, petitioner further asserts that "Mr. Carbonara provided his tax counsel and tax preparer with the necessary and accurate information to evaluate the transaction and to prepare the tax return." We see no inadequacy in the expertise of the advisers, but petitioner has not shown that Mr. Carbonara provided them with all the relevant and accurate information to evaluate the deduction.

> Treasury Regulation § 1.6664-4(c)(1)(i) provides:
>
> The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. . . . In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.

Petitioner's briefs press the particular arguments that it had reasonable cause for its claim of conservation purposes and that it had reasonable cause for its claim of value. Its briefs do not address the question whether it had reasonable cause in connection with the inventory issue under section 170(e)(1)(A), and we could stop our analysis of the reasonable cause issue there. But if we consider the issue further with no help from petitioner, the only mention of the issue that we find in the evidence is in the opinion letter upon which petitioner relies for its reasonable cause defense, and it is not at all helpful to petitioner on this point. The opinion letter from Bryan Cave, LLP, states the following:

> Based on the representations from the Owner [i.e., Mr. Carbonara], and we have no knowledge to the contrary, that the Property does not constitute stock in trade or inventory and because the Property is not one of the other types of property listed in Code Section 1221 that do not qualify as "capital assets," the Property is a capital asset.

That is, the opinion letter from the tax advisers plainly shows that they were aware—and made petitioner aware—of the effect that inventory character has on a charitable contribution deduction, but petitioner's advisers expressly stated that, in opining favorably on the deduction, they relied on petitioner's representations that the property was not inventory but rather was a capital asset. The lawyers did not opine that the property was non-inventory; they *assumed* that it was non-inventory because Mr. Carbonara so represented.

[*70]  Mr. Carbonara, however, was of course well aware that Mr. Grant and Mr. Grant's real estate partners (who had initially acquired the Mill Road Tract and had contributed it to Mill Road 36) were real estate professionals who held land as inventory for sale, and Mr. Carbonara had negotiated with Mr. Grant for the purchase of multiple properties in Henry County.  There is no evidence (nor even any assertion) that Mr. Carbonara disclosed this information to his tax advisers, and it therefore appears that he "fail[ed] to disclose a fact that [he] kn[ew], or reasonably should [have] know[n], to be relevant to the proper tax treatment of an item."  Treas. Reg. § 1.6664-4(c)(1)(i).  Petitioner has therefore failed to establish a sufficient predicate for reasonable cause relief from the imposition of an accuracy-related penalty under section 6662 on the basis of reliance on the advice of a professional tax adviser.

d.  *20% penalty as to negligence*

As to the portion of the understatement of income tax that is attributable solely to the inventory issue, and in the event that the understatement for any partner is small enough that, on his return, that understatement is not "substantial" under section 6662(d)(1)(A), we also hold, in the alternative, that the underpayment is attributable to negligence under section 6662(b)(1).  Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances.  *See, e.g., Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010).  It also "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return."  Treas. Reg. § 1.6662-3(b)(1).

We hold that the negligence penalty is applicable, essentially for the same reasons, discussed above in Part VI.B.3.c, that "reasonable cause" does not excuse the substantial understatement (and it follows that "reasonable cause" likewise does not excuse the negligence).  Mr. Carbonara was a highly sophisticated and knowledgeable investor, and he was well aware of all the facts that, as we explain above in Part V, result in petitioner's being limited to a deduction for its carryover basis.  On that issue, petitioner has pointed us to no evidence to contradict the implications of the law firm's opinion letter: Mr. Carbonara had been made aware of the capital-vs.-inventory issue, but he deflected the lawyers from evaluation of that issue by representing to them "that the Property does not constitute stock in trade or inventory".  He cannot blame the lawyers for a wrong answer

**[\*71]** to a question that he answered himself.  We do not see evidence that petitioner, acting through Mr. Carbonara, made "a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return."  Treas. Reg. § 1.6662-3(b)(1).

VII.    *Conclusion*

The appraisal attached to Mill Road 36's tax information was a "qualified appraisal" within the meaning of Treasury Regulation § 1.170A-13(c)(3).  The Mill Road Tract easement donation satisfies the requirements of section 170(h) to be a qualified conservation contribution, such that a charitable contribution deduction is allowable for Mill Road 36's donation to SCT.  The value of the Mill Road Tract easement was $900,000.  However, because the Mill Road Tract had been an inventory item within the meaning of section 724(d)(2), we hold that the amount of Mill Road 36's deduction is limited to $416,563, its adjusted basis in the encumbered portion of the Mill Road Tract.  Finally, we hold that the 75% fraud penalty under section 6663 is not applicable to Mill Road 36, but that the 40% accuracy-related penalty for a gross valuation misstatement under section 6662(h) is applicable to Mill Road 36.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

[*72]                              APPENDIX

Properties in Henry County for which
the Planning and Zoning staff issued
a recommendation of approval for conditional use
to operate an assisted living facility

| Entity | Concept Plan Units | Date of Conditional Use Evaluation Report | Date Acquired | Acres | Price per Acre[39] |
|---|---|---|---|---|---|
| Mill Road 36 Henry, LLC | 677 | 07/08/2016 | 08/28/2015 | 39.68 | $10,498 |
| Highway 81 Henry 55, LLC | 844 | 08/15/2016 | 12/29/2015 | 54.85 | 10,939 |
| Stroud Road Henry 640, LLC | 1,838 | 08/15/2016 | 01/27/2015 | 634.93 | 5,367 |
| Airline Road Property Holdings LLC | 656 | 08/24/2016 | 11/29/2016 | 39.5 | 9,925 |
| Hanger Highway 81 Henry 89, LLC | 672 | 09/13/2016 | 06/17/1991 | 86.12 | 1,682 |
| Harris Drive Henry 76, LLC | 750 | 09/13/2016 | 12/29/2015 | 73.21 | 11,380 |
| Highway 20 Henry 30, LLC | 585 | 09/13/2016 | 09/29/2011 | 29.29 | 9,450 |
| Island Shoals Henry 430, LLC | 1,733 | 09/13/2016 | 01/27/2015 | 421.01 | 4,761 |
| We Partner Weems 82, LLC | 696 | 09/13/2016 | 12/29/2015 | 82.58 | 6,055 |
| Foster Drive Henry 86, LLC | 650 | 03/06/2017 | 02/27/2016 | 85.24 | 10,000 |
| Fairview Road Henry 65, LLC | 840 | 03/22/2017 | 12/16/2016 | 53.25 | 10,798 |

---

[39] The listed price per acre reflects that paid by the acquiring entity for the subject property before its donation of the conservation easement.